# IN THE SUPREME COURT OF TEXAS

════════════
No. 14-1033
════════════

COMMUNITY HEALTH SYSTEMS PROFESSIONAL SERVICES CORPORATION, ET AL.,
PETITIONERS,

v.

HENRY ANDREW HANSEN, II, M.D., RESPONDENT

════════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS
════════════════════════════════════════════════════════

**Argued March 2, 2017**

JUSTICE GREEN delivered the opinion of the Court.

In this case, we must determine whether the court of appeals erred by reversing the trial court's order granting summary judgment in favor of multiple defendants on the plaintiff's claims for breach of contract and tortious interference with contract. Because we conclude that the plaintiff's employer was not required to prove the reasons it terminated the plaintiff's employment contract "without cause" and that the relevant provisions of the contract are not ambiguous, we hold that the employer is entitled to summary judgment on the plaintiff's breach of contract claim. We further hold that the hospital and its chief executive officer are entitled to summary judgment on the plaintiff's tortious interference claim because the plaintiff presented no evidence on the element of

willful or intentional inference. Finally, we hold that the employer's professional services company conclusively established its justification defense to the plaintiff's tortious interference claim and is therefore entitled to summary judgment. Accordingly, we reverse the court of appeals' judgment and reinstate the trial court's judgment in favor of the defendants.

## I. Background

This action arises from the "without cause" termination of a cardiovascular surgeon's five-year employment contract at the end of his third contract year.

In 2007, Thomas Jackson, the chief executive officer of the College Station Medical Center (the Hospital), sought to hire a board-certified cardiovascular surgeon so that the Hospital could offer heart surgeries without referring patients to other hospitals or paying to have a cardiovascular surgeon on call. Dr. Henry Andrew Hansen, II, M.D., a cardiovascular surgeon, wanted to move his practice from Lubbock to College Station, Texas, and he arranged a meeting with Jackson to discuss potential employment in College Station.

Acting as an intermediary between Dr. Hansen and Regional Employee Assistance Program (REAP), a non-profit corporation certified by the Texas Medical Board to employ physicians, *see* TEX. OCC. CODE § 162.001(b), Jackson negotiated the terms of Dr. Hansen's employment contract with REAP, under which Dr. Hansen would work at the Hospital.[1] After extensive negotiations in which Dr. Hansen was represented by counsel, REAP and Dr. Hansen entered into a five-year

_____

[1] The Hospital could not hire Dr. Hansen directly because state law prohibits corporations comprised of lay persons from employing physicians to practice medicine and receiving fees for the treatment those physicians provide. *See Gupta v. E. Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 752 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (discussing the statutory prohibition of the corporate practice of medicine).

employment contract, which ran from June 1, 2007, to April 30, 2012. Section 10.1 of the contract provided that during the first three contract years, the contract could be terminated only for cause. Following the end of the third contract year, however, either party could terminate the contract without cause with sixty days' notice if Dr. Hansen's "annual practice losses" exceeded $500,000 "at the end of years three, four or five." The contract further provided that in the event of a termination without cause, Dr. Hansen would "not be entitled to the due process rights established by [REAP] in its policies and procedures," but Dr. Hansen would "be entitled to such due process rights if . . . terminated for cause . . . pursuant to sections 10.2, 10.3 or 10.4 of [the contract]."

A month into Dr. Hansen's employment, Community Health Systems, Inc. acquired the Hospital and REAP. Community Health Systems Professional Services Corporation (PSC) is a subsidiary of Community Health Systems that provides advice on physician employment and termination decisions to other Community Health Systems subsidiaries that own health care facilities and employ physicians.

Dr. Hansen's practice at the Hospital was initially successful. The Hospital aggressively marketed Dr. Hansen and the new heart program, and Dr. Hansen performed approximately ten to fifteen procedures each month, including procedures that had not historically been done at the Hospital. Dr. Hansen was on pace to perform 100 procedures the first year and suggested that if another surgeon was hired, the Hospital could perform 200 procedures per year. At the end of Dr. Hansen's first contract year, PSC and the Hospital projected that the number of heart surgeries performed at the Hospital would continue to increase and yield financial returns.

At the end of 2008, however, the number of cardiovascular surgeries performed by Dr. Hansen began to decline significantly due to a series of personal disagreements with two local cardiologists, Dr. Marcel Lechin, M.D. and Dr. Mario Lammoglia, M.D. Dr. Lechin and Dr. Lammoglia were the senior members of a three-member cardiologist team, BCS Heart, which was Dr. Hansen's primary source of patient referrals.[2] PSC's vice president of practice management, Leslie Luke, became concerned and sent a letter to Jackson on February 11, 2009, recommending that Dr. Hansen's employment be terminated "without cause" at the end of the third contract year. Luke explained that: (1) Dr. Hansen's high salary—$750,000 per year—was disproportionate to the number of hospital procedures he performed; (2) Dr. Hansen's "clinic practice lost $1 million"; and (3) Luke predicted no future growth in the number of procedures. In June 2009, the chief financial officer of the Hospital approached Dr. Hansen to discuss his decreased billings and how to increase his billings. Nevertheless, the relationship between Dr. Hansen and the cardiologists continued to deteriorate and affect Dr. Hansen's practice.

In August 2009, Dr. Hansen had another dispute with Dr. Lechin, causing Dr. Lechin and Dr. Lammoglia to place Dr. Hansen and the Hospital on "drive-by" status, meaning that they would not refer new patients to Dr. Hansen for surgery at the Hospital. As a result of the ongoing disagreement, which Dr. Hansen described as a "turf battle," Dr. Hansen similarly refused to accept patients from the two doctors until they "cleared the air" in a joint meeting. After the meeting just one week later, Dr. Lechin and Dr. Lammoglia agreed to resume referring patients to Dr. Hansen,

---

[2] The third member of BCS Heart continued to refer patients to Dr. Hansen, but his practice was smaller and resulted in only five referrals to Dr. Hansen from August 5, 2009, to June 1, 2010.

4

but Dr. Hansen refused to accept the referrals until they issued a public affirmation of his skills as a cardiovascular surgeon. Ultimately, Dr. Hansen declined Dr. Lechin's and Dr. Lammoglia's referrals for approximately four months—from August 2009 to December 2009. Consequently, from August 5, 2009, to June 1, 2010, Dr. Hansen performed only eight heart surgeries.

At the annual meeting of REAP's board of directors in November 2009, Luke discussed Dr. Hansen's refusal to accept Dr. Lechin's and Dr. Lammoglia's referrals and stated that, except for providing emergency assistance, Dr. Hansen had not worked since September 2009. The meeting minutes noted that the purpose of the discussion "was to prepare the Board for a possible termination" if Dr. Hansen continued to refuse referrals and not fulfill his employment duties. On February 18, 2010, a PSC administrator, Ashley Bosshart, sent an email notifying the members of the REAP Board that Jackson had requested that REAP terminate Dr. Hansen's contract without cause due to his "past behavioral issues and his significant clinic losses." The email also attached the minutes from the November 2009 meeting and noted that Dr. Hansen's "annual losses" were $1,003,138 in calendar year 2008 and $908,609 in calendar year 2009. A few days later, but before the end of the third contract year, the REAP Board voted to terminate Dr. Hansen without cause at the end of his third contract year under section 10.1. Following the vote, Luke and Bosshart completed a "Personnel Action Form" reflecting that Dr. Hansen had been terminated for "unsatisfactory performance" and was not eligible for rehire. Subsequently, on June 1, 2010, REAP sent Dr. Hansen a letter providing sixty days' notice that it was terminating the contract without cause.

Thereafter, Dr. Hansen sued numerous parties alleging multiple causes of action. In his sixth amended petition, Dr. Hansen alleged that: (1) REAP is liable for breach of contract and breach of fiduciary duties; (2) the Hospital and Jackson are liable for business disparagement, tortious interference with contract, and restraint of trade; and (3) PSC is liable for business disparagement and tortious interference with contract.[3] In response, PSC filed an amended no-evidence and traditional motion for summary judgment. REAP, the Hospital, and Jackson, however, rested on their previously filed traditional and no-evidence motion for summary judgment. The trial court granted the defendants' summary-judgment motions without explaining the basis for its ruling.

Dr. Hansen appealed, challenging only the trial court's summary-judgment order rendering a take-nothing judgment on his claims for breach of contract, tortious interference with an existing contract, and business disparagement. The court of appeals reversed in part, reversing the trial court's dismissal of the claims for breach of contract and tortious interference but leaving intact the trial court's dismissal of Dr. Hansen's business disparagement claims. ___ S.W.3d ___, ___ (Tex. App.—Corpus Christi–Edinburg 2014, pet. granted) (mem. op.).

All of the defendants seek review of the court of appeals' decision, raising a number of issues, including: (1) whether REAP was required to prove on summary judgment that it terminated Dr. Hansen's contract on without-cause grounds; (2) whether the contract's stipulation for "annual practice losses" is ambiguous and, if not, whether REAP established the condition to terminate the contract without cause; (3) whether Dr. Hansen presented evidence raising a fact issue on the

---

[3] Dr. Hansen also sued Dr. Lechin and Dr. Lammoglia, but those claims were severed prior to Dr. Hansen's sixth amended petition. Dr. Hansen has since settled his claims against the cardiologists.

element of willful and intentional interference to overcome a no-evidence motion for summary judgment on his tortious interference claims; (4) whether the Hospital, Jackson, and PSC conclusively established the affirmative defense of legal justification to bar Dr. Hansen's tortious interference claims; (5) whether PSC waived its qualified-privilege defense by raising it only as a defense to business disparagement in its motion for summary judgment; and (6) whether the *Restatement (Second) of Torts*' truthful-information defense should be adopted in this case and, if so, whether fact issues nonetheless preclude summary judgment for the defendants. As explained below, we hold that the trial court did not err in granting summary judgment in favor of REAP on Dr. Hansen's breach of contract claim or in granting summary judgment in favor of the Hospital, Jackson, and PSC on Dr. Hansen's tortious interference claims.

## II. Standard of Review

We review a trial court's order granting summary judgment de novo, taking "as true all evidence favorable to the nonmovant," and "indulg[ing] every reasonable inference and resolv[ing] any doubts in the nonmovant's favor." *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003) (citing *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002); *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000); *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997)). Where, as here, a trial court does not specify the grounds on which it granted the motion for summary judgment, we must affirm if any of the grounds asserted in the motion are meritorious. *Id.* at 216. Further, when the motion asserts both no-evidence and traditional grounds, we first review the no-evidence grounds. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the nonmovant fails to produce more than a scintilla of evidence

7

on the essential elements of a cause of action challenged by a no-evidence motion, there is no need to analyze the movant's traditional grounds for summary judgment. *Id.*; *see* TEX. R. CIV. P. 166a(i). To prevail on a traditional motion for summary judgment, however, the movant must "show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *See Provident Life*, 128 S.W.3d at 216 (citations omitted); TEX. R. CIV. P. 166a(c). An issue is conclusively established "if reasonable minds could not differ about the conclusion to be drawn from the facts in the record." *Childs v. Haussecker*, 974 S.W.2d 31, 44 (Tex. 1998).

### III. Breach of Contract

For the reasons explained below, we hold that the court of appeals erred by reversing the trial court's order granting REAP's motion for summary judgment on Dr. Hansen's breach of contract claim.

### A. Grounds for a "Without Cause" Termination

The court of appeals assumed REAP had established that Dr. Hansen's "practice losses" exceeded the contractual threshold but nevertheless reversed the trial court's summary-judgment order, reasoning that REAP proved only that the contractual condition for a without-cause termination was met, not that it actually terminated Dr. Hansen on "without cause" grounds. ___ S.W.3d at ___. According to the court of appeals, to "uphold summary judgment for REAP without REAP having first established on which grounds it terminated [Dr. Hansen] would effectively require [the court of appeals] to read [the due process requirements of a for-cause termination] out of the Contract." *Id.* Thus, the court of appeals concluded that REAP did not disprove Dr. Hansen's breach of contract claim because it "did not conclusively establish the grounds on which it

8

terminated [Dr. Hansen's] employment." *Id.* at ___. We hold that the court of appeals erred on this point.

This case requires that we interpret the termination provisions in Dr. Hansen's employment contract. We construe unambiguous contracts as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). "An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008). A court may consider the parties' interpretation of the contract and admit extrinsic evidence to determine the true meaning of its terms only after the court has determined that the contract is ambiguous. *Id.* at 450–51 (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. CBI Indus., Inc.*, 907 S. W.2d 517, 520 (Tex. 1995) (per curiam)). When the controversy can be resolved by proper construction of an unambiguous document, rendition of summary judgment is appropriate. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 862 (Tex. 2000). "On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)).

The general rule is that, "absent a specific agreement to the contrary, employment may be terminated by the employer or the employee at will, for good cause, bad cause, or no cause at all." *Montgomery Cty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998) (citing *Fed. Express Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex. 1993) (per curiam); *Schroeder v. Tex. Iron Works*, 813

9

S.W.2d 483, 489 (Tex. 1991); *Winters v. Hous. Chronicle Pub. Co.*, 795 S.W.2d 723, 723 (Tex. 1990); *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733, 734–35 (Tex. 1985); *E. Line & R. R. R. Co. v. Scott*, 10 S.W. 99, 102 (Tex. 1888)). Further, a contract can modify an employee's at-will status and alter the procedural rights to which an employee is entitled if termination occurs. *See City of Odessa v. Barton*, 967 S.W.2d 834, 835 (Tex. 1998) (citing *Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 229 (Tex. 1986)). A contract can also stipulate that it is terminable without cause during one time period and is only terminable for cause at another time. *See Evan's World Travel, Inc. v. Adams*, 978 S.W.2d 225, 230 (Tex. App.—Texarkana 1998, no pet.).

Here, the relevant contractual provision, section 10.1, states:

> The Agreement can be cancelled for-cause only during years one through three. Either party may terminate this Agreement, without cause if annual practice losses exceed Five Hundred Thousand ($500,000) at the end of years three, four or five, by providing not less than Sixty (60) days prior written notice to the other party stating the intended date of termination. If Employer terminates this Agreement without cause . . . Physician shall not be entitled to the due process rights established by Employer in its policies and procedures. Physician shall be entitled to such due process rights if this Agreement is terminated for cause by Employer pursuant to sections 10.2, 10.3 or 10.4 of this Agreement.

The contract thus modifies Dr. Hansen's at-will status by allowing only "for-cause" termination during the first three years. *See id.*; *Brown*, 965 S.W.2d at 502. But in the last two years of the contract's term, the contract authorizes "without cause" termination of the contract "if annual practice losses exceed [$500,000]," and in the event of a without-cause termination, Dr. Hansen is

not contractually entitled to the due process he would receive if terminated for cause.[4] *See Barton*, 967 S.W.2d at 835.

We hold that the second sentence of section 10.1 clearly signifies a condition subsequent based on annual practices losses that enables either party to terminate the contract without cause; it does not state that the amount of annual practice losses is the only basis upon which the contract can be terminated without cause. A condition subsequent is "a condition referring to a future event, upon the happening of which the obligation becomes no longer binding upon the other party, if he chooses to avail himself of the condition." *E.g.*, *Rincones v. Windberg*, 705 S.W.2d 846, 848 (Tex. App.—Austin 1986, no writ) (citation omitted); *cf.* RESTATEMENT (SECOND) OF CONTRACTS § 224 cmt. e (AM. LAW INST. 1981). A condition subsequent excuses an already binding agreement. *Rincones*, 705 S.W.2d at 848. Although "no particular words are necessary for the existence of a condition," terms such as "'if,' 'provided that,' 'on condition that,' or some other phrase that conditions performance, usually connote an intent for a condition rather than a promise." *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976). Section 10.1 states that either party may terminate the contract with sixty days' written notice "if annual practice losses exceed

---

[4] We need not consider whether Dr. Hansen was nonetheless entitled to due process procedures under regulations of the Texas Medical Board because he did not present that argument in the trial court. *See* TEX. R. CIV. P. 166a(c). Rather, Dr. Hansen merely argued that, in violation of the Texas Medical Board's regulations, REAP failed to comply with the due-process procedures adopted by the REAP Board or as provided by the employment contract between REAP and Dr. Hansen. *See* 22 TEX. ADMIN. CODE § 177.4(2)(F) (stating that a health organization seeking certification under section 162.001(b) of the Texas Occupations Code must include in its application to the Texas Medical Board a copy of the health organization's by-laws, including a provision that "the termination of . . . any physician . . . may be accomplished only by the board of directors or its physician designee(s) and *such termination shall be subject to due process procedures adopted by the board of directors or its physician designee(s) or provided by the retention agreement between the health organization and the subject physician*" (emphasis added)).

11

Five Hundred Thousand ($500,000) at the end of years three, four or five." This is undoubtedly a condition subsequent.

Dr. Hansen construes the contract as requiring a certain procedure for a without-cause termination—that the REAP Board receive certain evidence of annual practice losses and that the REAP Board then terminate the contract on that basis alone. The contract's language, however, does not require the REAP Board to make a without-cause termination decision based solely on annual practice losses; rather, it provides that once the condition subsequent occurs, a without-cause termination can be premised on any reason, or no reason at all, and can be accomplished simply by providing sixty days' written notice.[5] In other words, assuming the condition subsequent has occurred, section 10.1's without-cause language is merely a termination-upon-notice provision, requiring only that REAP provide sixty days' written notice to Dr. Hansen stating the intended date of termination. *See* 14 TEX. JUR. 3d Contracts § 285 (2006) ("When a contract expressly provides that it is subject to termination upon notice, each party to the contract has the legal right to cancel the contract."). The notice need not state the ground, the fact that the condition subsequent has occurred, or anything beyond the requirements of the contractual provision. All that is required is (1) sixty days' written notice to the other party (2) stating the intended date of termination. Thus,

---

[5] Dr. Hansen's interpretation, which would transform the condition of the "without cause" provision into a "for cause ground," conflicts with the structure of the contract. For example, section 10.2 provides several "grounds" for terminating the contract immediately, including the physician's loss of a license to practice medicine, loss of medical malpractice insurance, unauthorized assignment of duties, indictment of a felony, and abandonment of his practice. Section 10.3 provides grounds for termination with ten days' notice, with an opportunity to cure, due to a breach of warranties made by the physician in the contract or a failure to participate in a management-care agreement. Section 10.4 provides breach of the contract as a ground for termination. These are the "for cause" grounds for terminating the contract, and per section 10.1, they were the only means for terminating the contract during the first three years of the contract.

because section 10.1 creates a condition subsequent authorizing without-cause termination, REAP did not need to prove that it terminated Dr. Hansen on "without cause" grounds—"without cause" signifies that the reason for the termination is irrelevant.[6]

Also absent from section 10.1 is any requirement that the REAP Board prove that it knew the annual practice losses condition had been satisfied at the time it voted to exercise its right to terminate the contract without cause. But Dr. Hansen argues the opposite: "The contract, as written, required the REAP Board to have evidence before it that Hansen's 'annual practice losses' exceeded $500,000 at the 'end of years three, four or five' before it could terminate the contract without cause and avoid having to provide due process." First, as discussed in more detail in the sections that follow, Dr. Hansen's third-year practice losses had already mounted to $686,888 in February 2010—when the REAP Board voted on Dr. Hansen's future termination. Furthermore, despite Dr. Hansen's argument that he was terminated on the date of the vote, he does not contest that he continued to receive his salary and all the other benefits of his position until July 31, 2010—sixty

---

[6] Texas courts have long held that when a party properly terminates a contract pursuant to a without-cause provision, the reason for the termination is irrelevant. *See, e.g.*, *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 665 (Tex. 1990) ("When a contract provides expressly that it is subject to termination upon notice, the general rule is that each party to the contract has a legal right to cancel the contract."); *Wood Motor Co. v. Nebel*, 238 S.W.2d 181, 185 (Tex. 1951) ("What the contract says is that 'certain other conditions' may create a desire on the part of either party to terminate the contract. If that desire is created, then the right to terminate by giving the prescribed notice is unqualified. Section 9 . . . . simply provides that [the contract] may be terminated by notice if either party so desires."); *Methodist Hosp. v. Halat*, 415 S.W.3d 517, 521 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (finding the reason for resignation "irrelevant" when physician properly terminated his employment contract pursuant to a without-cause provision); *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 65–66 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (holding that a party may terminate a contract pursuant to a without-cause or notice-termination provision without regard to the grounds for the termination and without incurring liability); *Allied Mortg. Capital Corp. v. Advantage Inv'rs Mortg. Corp.*, No. 14-07-00170-CV, 2008 WL 4547358, at *3 (Tex. App.—Houston [14th Dist.] Oct. 14, 2008, no pet.) (mem. op.) ("[G]iven our conclusion that Price's termination notice was not for cause, whether he had a proper basis for terminating for cause is irrelevant."); *Grant v. City of Mineral Wells*, 230 S.W. 854, 856 (Tex. Civ. App.—Fort Worth 1921, no writ) (explaining that the motive behind terminating a contract pursuant to its terms is "immaterial").

days after REAP informed him of the without-cause termination at the end of the third contract year. Finally, Dr. Hansen's interpretation of this additional requirement is incorrect because section 10.1 does not require REAP to prove that it knew Dr. Hansen's third-year practice losses had exceeded $500,000 at the time it voted on the without-cause termination in February 2010 or when it provided notice of the termination in June 2010. Rather, section 10.1 simply requires REAP to prove that, when it exercised its right to terminate the contract without cause in June 2010: (1) the third year of Dr. Hansen's contract had ended; (2) Dr. Hansen's third-year annual practice losses exceeded $500,000; and (3) sixty days' notice was provided. We decline Dr. Hansen's request to add language to the contract. *See Republic Nat'l Life Ins. Co. v. Spillars*, 368 S.W.2d 92, 94 (Tex. 1963) (explaining that a contract must be enforced as written when the language of the contract is plain and unambiguous).

Given that section 10.1 simply provides that either party may terminate the contract without cause on sixty days' written notice if Dr. Hansen's annual practices losses exceed $500,000 in his third, fourth, or fifth year, we conclude that the court of appeals erred. Indeed, we interpreted a similar provision in *Juliette Fowler Homes, Inc. v. Welch Associates, Inc.*, 793 S.W.2d 660 (Tex. 1990), which stated, "This agreement may be cancelled by either party with the cancellation to be effective sixty days after the mailing or personal delivery of a written notice of cancellation . . . ." *Id.* at 665 n.8. The plaintiff did not contest that written notice of termination was properly given; rather, it claimed that the termination constituted a breach of contract because there was no good-faith reason for the termination. *Id.* at 665. We disagreed, explaining:

14

> When a contract provides expressly that it is subject to termination upon notice, the general rule is that each party to the contract has the legal right to cancel the contract. . . . [T]he parties bargained for the flexibility of terminating the contract upon tender of the requisite notice. Neither party should be denied the benefit of its bargain. We hold that Fowler properly terminated the . . . contract pursuant to its express terms; therefore, Welch's breach of contract claim . . . must fail.

*Id.* (internal citation omitted). Aside from the condition subsequent, section 10.1 of Dr. Hansen's contract is virtually identical to the provision in *Juliette Fowler*. The provisions in both contracts are effectively "termination-upon-notice" provisions, and "[a] contract that a party may terminate under such a clause is terminable at will." 14 TEX. JUR. 3d Contracts § 263 (2006).

In short, the court of appeals' decision conflicts with the longstanding precedent cited above,[7] which holds that a party does not need "grounds" to terminate a contract in accordance with a without-cause or termination-upon-notice provision. REAP was not required to prove or disprove any "grounds" for termination; it was required only to establish that: (1) the condition subsequent occurred at the end of the third year of the contract; and (2) it provided sixty days' written notice to Dr. Hansen. Given the court of appeals' assumption that the annual practices losses condition was satisfied, the court was left with a provision allowing for the contract's termination with sixty days' written notice.

### B. Propriety of the Trial Court's Summary-Judgment Order

As explained above, to prevail on summary judgment, REAP had to present conclusive evidence that: (1) the "annual practice losses" condition subsequent was satisfied when REAP

---

[7] *See* note 6, *supra*.

exercised its right; and (2) REAP provided Dr. Hansen with sixty days' written notice specifying the date on which his termination would become effective.  We hold that REAP satisfied this burden.

## 1. Notice Requirement

First, it is undisputed that REAP complied with the notice requirement.  The third year of the contract ended on April 30, 2010.  On June 1, 2010, REAP sent Dr. Hansen a termination letter stating that REAP was terminating Dr. Hansen "without cause, pursuant to Section 10.1" and that "the effective date of termination shall be July 31, 2010."  Thus, REAP's summary-judgment evidence conclusively establishes that it complied with the notice requirement.

## 2. "Annual Practice Losses" Condition Subsequent

We also conclude that REAP conclusively established that Dr. Hansen's third-year annual practice losses exceeded $500,000, such that the trial court's summary-judgment order dismissing Dr. Hansen's breach of contract claim was proper.

REAP supported its motion for summary judgment with the following evidence: (1) affidavit testimony from the Hospital's chief financial officer, Benjamin Cluff; (2) trend reports prepared by Cluff's office during the time of Dr. Hansen's employment; and (3) deposition testimony from Leslie Luke, PSC's vice president of practice management.  Cluff testified that he was in charge of calculating the profits or losses associated with Dr. Hansen's practice during Dr. Hansen's tenure with REAP.  Cluff testified:

> From May 1, 2009 through April 30, 2010, Dr. Hansen's practice losses were $942,180.  I reached this number by subtracting the expenses associated with Dr. Hansen's provision of professional medical services during this time frame from the revenue received from Dr. Hansen's provision of professional medical services. This resulted in Dr. Hansen incurring practice losses of $942,180 from May 1, 2009,

16

through April 30, 2010. The calculations are accurately reflected by the Trend Report attached . . . as Exhibit O . . . .

Cluff explained that his office provided the trend reports to Dr. Hansen several times each year during his employment with REAP, including the time period of May 1, 2009, through April 30, 2010—the third year of Dr. Hansen's contract. According to Cluff's unrefuted testimony, Dr. Hansen never questioned the fact that these trend reports showed consistent practice losses and never questioned the method of calculating his practice losses.

Although difficult to read, the trend reports paint a gloomy picture. The reports show that Dr. Hansen's practice sustained losses as follows:

| | |
|---|---|
| May 2009 | ($107,650) |
| June 2009 | ($60,012) |
| July 2009 | ($52,234) |
| August 2009 | ($91,512) |
| September 2009 | ($96,142) |
| October 2009 | ($88,638) |
| November 2009 | ($58,174) |
| December 2009 | ($58,674) |
| January 2010 | ($73,851) |
| February 2010 | ($100,783) |
| March 2010 | ($81,446) |
| April 2010 | ($73,063) |
| **Total** | **($942,180)** |

The trend reports indicate that Dr. Hansen's revenue included patient revenues, less contractual adjustments for Medicare and Medicaid. The net profit or loss was calculated by deducting from revenues certain expenses, including salaries and benefits, bad debt expense, supplies, medical

17

specialist fees, purchased services, marketing, utilities, repairs and maintenance, property taxes and insurance, other operating expenses, and rent. This calculation yields a loss of $942,180 from May 2009 through April 2010.

Luke testified that he interprets "practice losses" to mean the revenue associated with the services personally provided by a physician, minus the expenses incurred by that physician while practicing—"[y]ou take the revenue, subtract expenses, you end up with practice profit or loss." Moreover, Luke explained that "practice losses" are calculated by subtracting the clinic expenses from clinic revenue and that all of the revenue from Dr. Hansen's provision of medical services was billed through "the clinic tax ID number" regardless of whether the services were provided at the Hospital or at his office. Thus, "clinic" revenues would include revenues from Dr. Hansen's work performed in his clinical office and at the Hospital.

Dr. Hansen countered REAP's traditional motion for summary judgment in two ways. First, Dr. Hansen objected to REAP's evidence.[8] Second, in his amended response to REAP's motion, Dr. Hansen argued that REAP breached the contract by terminating him: (1) without providing due process as required by the procedures adopted by the REAP Board in its by-laws; (2) without providing due process required under the contract; (3) based on so-called "practice losses" because the term is ambiguous; (4) for "clinic losses," a ground not provided for in the contract; and (5) prematurely under the contract's terms.

---

[8] Dr. Hansen reasserts these five objections in his response to REAP's petition for review. We hold that these objections lack merit.

Absent from Dr. Hansen's response and rebuttal evidence, however, was anything refuting that Dr. Hansen's annual practice losses at the end of the third contract year exceeded $500,000. Indeed, Dr. Hansen introduced no evidence that including unidentified revenue streams or excluding certain expenses would result in practice losses in an amount less than $500,000.[9]  Instead, Dr. Hansen focused his arguments on the subjective intent and knowledge of the REAP Board leading up to his termination, the purported ambiguity of the term "practice losses" as used in the contract, his contention that REAP actually terminated him "for cause" without providing due process as required under the contract, and his claim that REAP was nevertheless required to provide Dr. Hansen due process regardless of the type of termination according to REAP's by-laws.  We reject these arguments for the reasons explained earlier.

With respect to the ambiguity argument, Dr. Hansen argued that the term "practice losses" is susceptible to more than one reasonable interpretation, including: (1) his practice's contribution to maintain cardiovascular surgical volume producing a net earnings before interest, taxes, depreciation, and amortization for the Hospital; (2) his practice's contribution to maintain the profitability of the cardiovascular product service line at the Hospital; (3) his "clinic losses" as alleged by Jackson to the REAP Board when advocating for the "without cause" termination of Dr. Hansen's contract; or (4) his practice's "income minus expenses in the actual clinic."  To support his arguments, Dr. Hansen included an affidavit from his accounting expert, Brandon Durbin, who

_____

[9] The only evidence suggesting these figures could be inaccurate was an email Jackson sent to Luke in February 2008 directing Luke to add some revenue credit to Dr. Hansen that was mislabeled.  However, the email relates to a time period that is irrelevant in determining whether the contractual condition was met.  Old emails and reports discussing Dr. Hansen's contribution to the Hospital's revenue in 2008 provide no evidence of the financial situation in Dr. Hansen's third contract year (May 2009 through April 2010).

opined that the term "practice losses" is ambiguous. Durbin did not testify to or opine on the amount of Dr. Hansen's practice losses from May 2009 through April 2010. Rather, Durbin contended that the contract's inclusion of the phrase "practice losses" contemplates a calculation that not only includes revenues received by REAP as the result of Dr. Hansen's practice but also includes revenues received by the Hospital.

Despite Dr. Hansen's argument to the contrary, the contract's use of the term "practice losses" is not ambiguous. Throughout the contract, the use of the term "practice" signifies Dr. Hansen's provision of medical services. For example, in the contract, REAP disclaims any intention to "dictate Physician's practice of medicine" and notes that Dr. Hansen shall retain control of the treatment of patients. Further, the contract designates the "primary clinical site for the medical practice by the Physician." The contract does not distinguish between medical services that Dr. Hansen provides at the clinical office and the Hospital. Instead, the contract stipulates that Dr. Hansen has a duty to provide "professional medical services at the Medical Office(s) and at Hospital" and that REAP has the exclusive right to "retain all professional fees for professional medical services rendered by Physician . . . , whether such professional medical services are provided to patients in the Medical Office(s), in Hospital or at any other location." The contract also makes clear that Dr. Hansen was employed by REAP, not the Hospital, so "practice losses" are Dr. Hansen's REAP practice gains or losses rather than the Hospital's gains or losses. This makes sense—Dr. Hansen was employed by REAP to practice medicine. The contract states that its purpose is to employ Dr. Hansen on a full-time basis to provide "professional medical services" on behalf of REAP, which are identified as "the practice of Cardiovascular Surgery."

20

Furthermore, the contract is silent regarding the health care services provided by the Hospital. Rather, the contract identifies the revenues and expenses associated with Dr. Hansen's "practice," stating that the revenues are the earnings derived from Dr. Hansen's performance of "professional medical services" and that the expenses are the costs incurred through Dr. Hansen's performance of those services (including, but not limited to, expenses for Dr. Hansen's salary, benefits, vacation time, continuing education, medical malpractice insurance, office space, equipment, furniture, utilities, supplies, and support personnel at the medical office at which Dr. Hansen practiced). The contract does not reference the Hospital's revenues or expenses. Thus, Dr. Hansen's "practice" gains or losses are REAP's revenues from Dr. Hansen's practice of medicine minus REAP's expenses for Dr. Hansen's practice of medicine. Stated differently, the term "practice losses" refers to REAP's losses after subtracting the expenses REAP incurred from the revenue REAP earned from Dr. Hansen's provision of medical services at any location—the same formula Cluff used in calculating the $942,180 figure for Dr. Hansen's year-three practice losses.

Dr. Hansen's argument that the term "practice losses" is ambiguous is based not on the contract's text, but on: (1) an affidavit by an expert; and (2) the use of the terms "annual losses" and "clinic losses" in emails and in the minutes of REAP board meetings. But extrinsic evidence cannot be used to create ambiguity in the contract's text. *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015); *see Haden*, 266 S.W.3d at 450–51 (explaining that evidence outside the four corners of a contract cannot be used to create an ambiguity). Thus, the only two questions are: (1) whether the contract itself is ambiguous regarding the term "annual practices losses"; and (2) if

21

not, whether Cluff's calculations yield Dr. Hansen's year-three annual practice losses as that term is used in the contract.[10]

In sum, reasonable minds could not disagree that Dr. Hansen's annual practice losses in the third contract year exceeded $500,000 given the financial data and calculations in the record. Through Cluff's affidavit and the supporting trend reports, coupled with Luke's deposition testimony, REAP established that Dr. Hansen's practice losses from May 1, 2009, through April 30, 2010, amounted to $942,180. Thus, REAP's summary-judgment evidence establishes that the condition allowing for Dr. Hansen's without-cause termination under section 10.1 was satisfied and that it properly terminated the contract pursuant to the without-cause provision. Therefore, as a matter of law, REAP did not breach the contract.

## IV. Tortious Interference with an Existing Contract

We next examine the propriety of the court of appeals' decision on the defendants' summary-judgment motions on Dr. Hansen's tortious interference claims. We address the Hospital and

---

[10] Dr. Hansen seems to argue that the term "practice losses" should be determined based on Dr. Hansen's "enterprise value" with the Hospital. However, Dr. Hansen's interpretation is not supported by the language in the contract for the reasons just explained. Further, if we were to accept Dr. Hansen's position that his REAP physician practice losses are based on hospital revenue, it would violate state law restricting the corporate practice of medicine, making the contract void as a matter of law. *See Gupta*, 140 S.W.3d at 752 (explaining that the Texas Medical Practice Act prohibits a corporation comprised of lay persons from employing licensed physicians to treat patients and then receiving fees for the treatment provided). Indeed, Dr. Hansen acknowledges in his brief that he and the Hospital must be considered separate under Texas law. Thus, the Hospital's revenues could not have been considered when calculating Dr. Hansen's practice losses. Courts cannot construe a contract to impose or enforce an illegal obligation. *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 239 (Tex. 2016). When two constructions of a contract are possible, the courts must apply the one that does not result in a violation of law. *Id.* Thus, the "professional medical services" rendered by Dr. Hansen and contemplated by the contract cannot, as a matter of law, include services provided or revenues received by the Hospital.

Jackson separately from PSC because the Hospital and Jackson filed a joint motion for summary judgment while PSC filed its own motion.

## A. Applicable Law

To establish a claim for tortious interference with a contract, a plaintiff must establish: (1) the existence of a valid contract subject to interference; (2) that the defendant willfully and intentionally interfered with the contract; (3) that the interference proximately caused the plaintiff's injury; and (4) that the plaintiff incurred actual damage or loss. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002). Intentional interference does not require intent to injure, only that "the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992) (citation omitted).

## B. Analysis

### 1. The Hospital and Jackson

The trial court granted the Hospital and Jackson's no-evidence and traditional motion for summary judgment on Dr. Hansen's tortious interference claim. However, the court of appeals reversed, holding that: (1) nothing indicated that Jackson was acting as REAP's agent when he allegedly interfered with Dr. Hansen's employment contract; (2) Dr. Hansen raised a fact issue as to whether the Hospital and Jackson interfered with the contract, based in part on its holding that a fact issue existed on Dr. Hansen's breach of contract claim; and (3) the trial court could not have granted summary judgment on the traditional ground urged in the motion because the Hospital and

23

Jackson failed to amend their motion to address new claims alleged in Dr. Hansen's sixth amended petition. ___ S.W.3d at ___, ___.

The Hospital and Jackson raise a number of arguments regarding the court of appeals' decision. First, they argue that the court of appeals erred by holding that no evidence showed that Jackson acted as REAP's agent when he requested that REAP terminate Dr. Hansen's contract and by holding that Dr. Hansen was not required to produce evidence raising an issue of material fact as to whether Jackson acted entirely out of his own interests and not REAP's. That is, the Hospital and Jackson argue that Jackson could not have tortiously interfered because Jackson was REAP's agent and thus not a stranger to the contract. Second, they argue that the court of appeals erred in overturning the summary judgment on Dr. Hansen's tortious interference claim because no evidence showed that REAP breached the contract. Third, they argue that they established the affirmative defense of justification. We conclude that the court of appeals erred by holding that no evidence indicates that Jackson was acting as a REAP agent at the time of the alleged interference and that summary judgment was proper because Dr. Hansen failed to raise a question as to whether Jackson was motivated solely by his own interests.

To prove the willful and intentional interference element of a tortious interference claim, the plaintiff must show that the defendant was legally capable of tortious interference. *See Holloway v. Skinner*, 898 S.W.2d 793, 795–96 (Tex. 1995). To be legally capable of tortious interference, the defendant must be a stranger to the contract with which he allegedly interfered. *Id.* at 794–95. In *Holloway v. Skinner*, we extended this rule to corporate agents—because corporations can act only

through agents, the general rule is that a corporation's agent cannot tortiously interfere with the corporation's contract, except under limited circumstances. *Id.* at 795–96.

In *Holloway*, the holder of a corporation's promissory note sued a corporate officer who owned a non-controlling share of the corporation for tortiously interfering with the note by inducing the corporation's default. *Id.* at 794. The trial court rendered judgment against the corporate officer on the tortious interference claim in accordance with the jury's verdict. *Id.* After the court of appeals affirmed the trial court's judgment, we granted the corporate officer's petition for review. *Id.* In our decision, we first noted the well-established principle that a party must be a stranger to a contract to be subject to a tortious interference claim—that is, a party to a contract cannot tortiously interfere with its own contract. *Id.* at 794–95. We explained further that the plaintiff alleged interference by an individual who was also the lawful representative of the corporation. *Id.* at 795. Recognizing that "[d]oing business through corporate structures is a . . . necessary incident of business life," and in furtherance of the policy rationale that corporate agents should be free to advise the corporation without fear of third party claims of tortious interference, we held:

> [W]hen the defendant serves the dual roles of the corporate agent and the third party who allegedly induces the corporation's breach. . . . [t]o establish a prima facie case . . . the alleged act of interference must be performed in furtherance of the defendant's personal interests so as to preserve the logically necessary rule that a party cannot tortiously interfere with its own contract.

*Id.* at 795–96 (citation omitted). Thus, for a plaintiff "to meet his burden in a case of this nature, the plaintiff must show that the defendant acted in a fashion so contrary to the corporation's best interests that his actions could only have been motivated by personal interests." *Id.* at 796. Because the plaintiff failed to present such evidence at trial, we held that no evidence supported the jury's

finding of the second element of tortious interference: a willful or intentional act of interference by the defendant acting in his personal capacity. *Id.* at 796–97.

Thus, under our decision in *Holloway*, when the defendant is both a corporate agent and the interfering tortfeasor, the plaintiff carries the burden of proving as part of its "prima facie case" that the agent "acted in a fashion so contrary to the corporation's best interests that his actions could only have been motivated by personal interests" and thus could not have been acting within the scope of his agency at the time of the interference. *Id.* at 796; *see also Latch v. Gratty, Inc.*, 107 S.W.3d 543, 545 (Tex. 2003) (per curiam) ("Furthermore, an agent cannot be held to have acted against the principal's interests unless the principal has objected.").

Although we have repeatedly explained in cases following *Holloway* that this narrow rule arises "[w]hen the defendant is both a corporate agent and the third party who allegedly induces the corporation's breach," *see, e.g.*, *Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456–57 (Tex. 1998) (per curiam), we have not yet explored how *Holloway* applies when a corporate agent moves for summary judgment on no-evidence grounds. Furthermore, the defendant's status as an agent of the party to the underlying contract was not at issue in our subsequent decisions applying *Holloway*. *See, e.g.*, *In re Vesta Ins. Grp., Inc.*, 192 S.W.3d 759, 760 (Tex. 2006) (per curiam); *Latch*, 107 S.W.3d at 546; *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 78 (Tex. 2000); *Allen*, 985 S.W.2d at 456; *Morgan Stanley & Co. v. Tex. Oil Co.*, 958 S.W.2d 178, 178 (Tex. 1997); *ACS Inv'rs*, 943 S.W.2d at 429, 432. We hold that under the circumstances of this case, in which the summary-judgment record reveals no factual dispute as to the defendant's status as an agent of one party to the underlying contract, Dr. Hansen had the burden to prove as part of his "prima facie

26

case"—and to therefore avoid summary judgment on no-evidence grounds—that Jackson "acted in a fashion so contrary to the corporation's best interests that his actions could only have been motivated by personal interests." *See Holloway*, 898 S.W.2d at 796; *see also Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) ("A no evidence point will be sustained when . . . the evidence conclusively establishes the opposite of the vital fact."). Accordingly, we must determine whether the summary-judgment record conclusively establishes Jackson's status as REAP's agent at the time of his alleged interference.

To establish the existence of an agency relationship, the evidence must demonstrate the purported agent's consent to act on the principal's behalf and subject to the principal's control, together with the purported principal's authorization for the agent to act on his behalf. *Grissom v. Watson*, 704 S.W.2d 325, 326 (Tex. 1986). Thus, we must determine whether the summary-judgment record establishes that, at the time of Jackson's alleged interference, Jackson had consented to act on REAP's behalf and subject to REAP's control and that REAP had authorized Jackson to act on its behalf. As explained below, we conclude that the record conclusively establishes Jackson's status as REAP's agent, placing a burden on Dr. Hansen, as part of his prima facie case, to present evidence showing that Jackson "acted in a fashion so contrary to [REAP]'s best interests that his actions could only have been motivated by personal interests." *Holloway*, 898 S.W.2d at 796.

First, although not determinative, we note that Dr. Hansen argued in earlier pleadings and motions that Jackson was REAP's agent. For example, Dr. Hansen argued previously that "[o]nly Jackson, as an agent, both of [the Hospital] and REAP, could tell Dr. Hansen that he could not go

to a clinic staffed by other REAP doctors that fed [the Hospital] with patients." Dr. Hansen also argued that "Jackson, as an agent both of [the Hospital] and REAP, had power to exclude Dr. Hansen from the market for medical services to patients at [the Hospital's] feeder clinics." Indeed, in Dr. Hansen's sixth amended petition, the live pleading at the time the trial court ruled on the Hospital and Jackson's motion for summary judgment, Dr. Hansen alleged that Jackson notified a PSC employee "that REAP wished to terminate Dr. Hansen's agreement"—demonstrating Jackson's consent to act on REAP's behalf. Dr. Hansen made the same assertion in response to the Hospital and Jackson's motion for summary judgment. Finally, in Dr. Hansen's response to the Hospital and Jackson's motion for summary judgment, Dr. Hansen highlighted an email in which Bosshart requested that the REAP Board convene to discuss Dr. Hansen's employment, which contemplated that it would be Jackson who, upon the board's decision, would notify Dr. Hansen that REAP had terminated the contract.

In addition to Dr. Hansen's arguments that Jackson was REAP's agent, it is undisputed that Jackson acted as REAP's agent when he negotiated the terms of Dr. Hansen's contract on behalf of REAP in 2007. In fact, Jackson executed the third amendment to Dr. Hansen's employment contract on behalf of REAP in September 2007, demonstrating that Jackson was REAP's agent at the time.

Furthermore, the summary-judgment record—including in large part Dr. Hansen's own evidence—establishes that Jackson continued to serve as REAP's agent during Dr. Hansen's dispute with the other cardiologists and when he recommended that the REAP Board terminate Dr. Hansen's contract in February 2010. For example, when Dr. Hansen's dispute with the BCS Heart cardiologists boiled over in 2009, Dr. Hansen sought Jackson's assistance, and Jackson attempted

28

to mediate the disagreement. Dr. Hansen testified that Jackson, acting as REAP's agent in December 2009, instructed him to stop working in a neighboring healthcare facility to ease the tensions between the feuding physicians. Further, Jackson undertook a review of Dr. Hansen's performance with respect to the treatment of certain patients in an attempt to resolve the dispute between Dr. Hansen and the cardiologists. Additionally, as the end of Dr. Hansen's third contract year approached, Dr. Hansen and Jackson began discussing a contract "renegotiation" in lieu of a "renewal." Indeed, Dr. Hansen testified that he and Jackson went back and forth about how much money Dr. Hansen would be paid in his fourth year working for REAP under a new employment agreement.[11]

In addition to the evidence showing that Jackson continued to serve as REAP's agent well into 2009 and 2010, Jackson testified that he has an ongoing role as REAP's agent as part of his position as CEO of the Hospital. Specifically, Jackson testified that one of his responsibilities as CEO of the Hospital is to serve as REAP's agent:

Q. Now, do you -- are you a part of REAP?

A. I'm an agent of REAP.

Q. And what does that mean?

A. That means I have the authority to provide a contract to a physician after it's been authorized by REAP.

Q. Do you have the authority to negotiate the contract?

A. I have the authority to suggest terms. If you want to define that as negotiate, then I can suggest terms; but ultimately it's the Regional Employee Assistance Program that has final approval on approving them.

_____

[11] Dr. Hansen ultimately rejected Jackson's offer for employment with REAP for an additional year at a salary of $425,000.

Q. Are you compensated in any way for providing that service as an agent for REAP?

A. I'm just compensated to be just one -- just the CEO of College Station Medical Center. Part of my job duties include being an agent of REAP.

Q. And so College Station Medical Center, which is the hospital, pays your salary to be an agent of REAP, correct?

A. It pays me to manage the hospital and do other duties; and this is one of those duties, is to be an agent of REAP.

This testimony, along with other evidence in the summary-judgment record, shows that Jackson was REAP's agent at all times relevant to Dr. Hansen's lawsuit. This is particularly clear in light of the evidence providing insight into the relationship between REAP and the Hospital. First, the record shows that Community Health Systems, Inc., a holding company that does not have any employees, took over the Hospital when it acquired Triad Health Corporation in 2007. As part of that acquisition, Community Health Systems took over the Hospital, PSC, and REAP. In other words, the record establishes that Community Health Systems is the parent company of all of the entities involved in Dr. Hansen's lawsuit. Moreover, Dr. Hansen responded to the Hospital and Jackson's motion with evidence confirming that REAP, the Hospital, and PSC are directly or indirectly owned by Community Health Systems. For example, Dr. Hansen filed Texas franchise tax reports showing that REAP is owned by Community Health Physicians Operations, a different Community Health Systems subsidiary and sister of PSC under the larger "Community Health Systems" corporate umbrella.

Additionally, Luke's deposition testimony shows that REAP relies on other Community Health Systems subsidiaries to support its operations. For example, Luke testified that REAP does

not employ paid staff or keep its own records. Rather, the purpose of the REAP Board is to "ensure that the physicians who are employed are properly credentialed. They review their credentialing packet and approve the employment of those physicians. And then they also exercise rights under certain contracts. They can also terminate physicians, if necessary. That's pretty much it." Representatives from PSC and the hospitals and clinics at which REAP's physicians operate report to and brief the REAP Board on financial, operational, and quality matters with respect to REAP's physicians. In short, the evidence on file with the trial court when it ruled on the defendants' summary-judgment motions clearly shows that REAP, which acts through its board of directors, does not do much more than vote on the employment and termination of physicians.

Dr. Hansen argues that the evidence shows that Jackson was not acting as REAP's agent when the REAP Board met to terminate Dr. Hansen's employment contract. Specifically, Dr. Hansen contends that Jackson announced that he was acting in his capacity as CEO of the Hospital when he requested that the REAP Board terminate Dr. Hansen's contract. Dr. Hansen points to the minutes of the February 2010 board meeting, which state: "A. Bosshart was notified by Thomas Jackson, Chief Executive Office [sic] of College Station Medical Center, that REAP wished to terminate Dr. Henry Hansen's agreement without cause pursuant to section 10.1 of the agreement." However, these minutes—prepared as a summary of the meeting—do not show that Jackson was not REAP's agent at the time of the meeting; rather, the minutes show that Jackson, speaking on behalf of REAP, expressed that "REAP wished to terminate" Dr. Hansen. The fact that the minutes state Jackson's title as CEO of the Hospital does not raise an issue of material fact.

31

Dr. Hansen also points to Bosshart's email calling the REAP Board to the February 2010 telephone meeting, in which Bosshart wrote:

> Due to his past behavior issues and his significant clinic losses, the CEO of the facility has requested that the 5.01(a) Board terminate Dr. Hansen's employment agreement without cause. I have attached a letter drafted by the CEO, Tom Jackson, intended for Dr. Hansen. Tom will not provide Dr. Hansen with this letter until May 3, 2010, which is the date REAP contractually fulfills their part of Dr. Hansen's agreement with regard to not terminating his contract without cause.

Again, the fact that Bosshart referred to Jackson as CEO of the Hospital does not establish that Jackson was no longer REAP's agent in February 2010. And the fact that Jackson was requesting that the REAP Board terminate Dr. Hansen's contract does not negate his status as REAP's agent, as it is undisputed that only the REAP Board could vote to terminate Dr. Hansen's contract.

In light of all of this evidence, we conclude that the summary-judgment record conclusively establishes that Jackson was REAP's agent at all times relevant to Dr. Hansen's lawsuit. Therefore, we next consider whether Dr. Hansen presented evidence showing that the Jackson "acted in a fashion so contrary to [REAP]'s best interests that his actions could only have been motivated by personal interests" and thus could not have been acting within the scope of his agency at the time of the interference. *Holloway*, 898 S.W.2d at 796.

As explained already, a plaintiff suing a corporate agent for tortious interference must prove that "the agent acted 'so contrary to the corporation's interests that his or her actions could only have been motivated by personal interest.' Furthermore, an agent cannot be held to have acted against the principal's interests unless the principal has objected." *Latch*, 107 S.W.3d at 545 (quoting *ACS Inv'rs*, 943 S.W.2d at 432; citing *Allen*, 985 S.W.2d at 457). To avoid summary judgment, the

32

plaintiff must present evidence raising a question as to whether "the agent acted willfully and intentionally to serve the agent's personal interests at the corporation's expense. A corporate officer's mixed motives—to benefit both himself and the corporation—are insufficient to establish liability." *Allen*, 985 S.W.2d at 457 (citing *Holloway*, 898 S.W.2d at 798; *ASC Inv'rs*, 943 S.W.2d at 432). Additionally, because a principal is a superior judge of its own best interests, we consider the principal's evaluation of the agent's actions when determining whether the corporate agent acted against the principal's interests. *Id.* If the principal "does not complain about its agent's actions, then the agent cannot be held to have acted contrary to the corporation's interests." *Id.*

We hold that Dr. Hansen failed to present any evidence showing that Jackson was motivated only by his own personal interests with respect to his role in Dr. Hansen's termination. Dr. Hansen's amended response to the Hospital and Jackson's motion merely alleges that "Jackson and the Hospital were third parties to the REAP agreement with Dr. Hansen." Moreover, Dr. Hansen's response simply reiterates the allegations raised in his sixth amended petition and highlights the minutes from the February 2010 REAP board meeting. However, this evidence does not show that Jackson was motivated solely by his own personal interests when he requested that the REAP Board terminate Dr. Hansen's contract, and we find nothing in Dr. Hansen's response to the Hospital and Jackson's motion raising a question as to Jackson's motives. Further, Dr. Hansen has not offered any evidence showing that REAP was dissatisfied with or objected to Jackson's recommendation that it terminate Dr. Hansen without cause at the end of his third contract year. We conclude that Dr. Hansen failed to present evidence raising a genuine issue of material fact as to the second element of tortious interference—a willful or intentional act of interference. As a result, we hold that

33

the trial court properly granted summary judgment on Dr. Hansen's tortious inference claims against the Hospital and Jackson without reaching their other grounds for summary judgment.[12]

## 2. PSC

The court of appeals reversed the trial court's order granting PSC's traditional and no-evidence motion for summary judgment. ___ S.W.3d at ___. While we agree with the court of appeals' conclusion that PSC is not entitled to summary judgment on no-evidence grounds, we conclude that the court of appeals erred by holding that PSC had not conclusively established its justification defense.

### a. No-Evidence Grounds

The court of appeals rejected PSC's no-evidence grounds to Dr. Hansen's tortious interference claim because it concluded that PSC's motion challenged only the evidence supporting the damages element of tortious interference with an existing contract. *Id.* We agree.

Rule 166a(i) of the Texas Rules of Civil Procedure requires that a no-evidence motion specifically state the element or elements for which there is no evidence. TEX. R. CIV. P. 166a(i). We have called for strict enforcement of this requirement. *See Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310–11 (Tex. 2009) (holding that a no-evidence motion must specifically identify the challenged elements to satisfy Rule 166a(i)); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 339–42 (Tex. 1993). Thus, a no-evidence motion that lists each element of the plaintiff's claim and then asserts that the plaintiff has no evidence to support "one or more" or "any of" those

---

[12] Specifically, we need not address the Hospital and Jackson's contention that summary judgment was proper because Jackson merely induced REAP to do what it had a legal right to do under the terms of the contract and because REAP did not breach the contract. We also need not reach the merits of the Hospital and Jackson's justification defense.

elements is insufficient to support summary judgment because this language does not clearly identify which elements, whether some or all, are challenged. *See, e.g.*, *Jose Fuentes Co. v. Alfaro*, 418 S.W.3d 280, 283–86 (Tex. App.—Dallas 2013, pet. denied); *Dentler v. Perry*, No. 04–02–00034–CV, 2002 WL 31557302, at *5 (Tex. App.—San Antonio Nov. 20, 2002, no pet.) (not designated for publication) (holding that a no-evidence motion arguing that the plaintiffs "have no evidence of any of the elements of the causes of action" was insufficient as a matter of law); *Teel v. Am. Title Co. of Hous.*, No. 14–00–00375–CV, 2001 WL 1097862, at *2 (Tex. App.—Houston [14th Dist.] Sept. 20, 2001, pet. denied) (not designated for publication) (holding that motion alleging that there was "no evidence of . . . any element of fraud" was inadequate because it did not identify any specific element).

> In PSC's amended no-evidence motion for summary judgment, PSC argued:
>
> [PSC] is entitled to summary judgment because the Plaintiffs have no evidence of any element of this cause of action. By way of example, there is no evidence:
>
> (1) that [PSC] engaged in unlawful interference with the contract, or
>
> (2) that [PSC]'s alleged conduct caused Plaintiffs any damages.

Thus, PSC's no-evidence motion challenged only whether Dr. Hansen could produce any evidence raising an issue of material fact on whether PSC "engaged in unlawful interference with the contract" or caused damages. However, interference by an unlawful means is not an essential element of the tort of interference with an existing contract, meaning that the trial court could not grant summary judgment on that ground. *See* TEX. R. CIV. P. 166a(i) (stating that a no-evidence motion for summary judgment "must state the elements as to which there is no evidence"); *Gish*, 286 S.W.3d

35

at 310–11; *see also Rust v. Tex. Farmers Ins. Co.*, 341 S.W.3d 541, 551 (Tex. App.—El Paso 2011, pet. denied) ("[B]ecause [the defendant] failed to specifically state the elements for which there is no evidence, the trial court did not err in denying [the] no-evidence component of the hybrid summary-judgment motion."). We agree with the court of appeals—given that PSC has not asserted on appeal that Dr. Hansen has no proof of damages, the only element of tortious interference with an existing contract challenged on no-evidence grounds, the trial court could not grant summary judgment on PSC's no-evidence motion.

### b. Traditional Grounds

PSC also raised the affirmative defense of justification in its traditional motion for summary judgment. PSC argued that even if its communications with the REAP Board interfered with Dr. Hansen's contract, such interference was justified by PSC's undisputed business relationship with REAP that required PSC to evaluate and provide advice to REAP on the performance and employment of REAP's physicians.[13] Although the court of appeals agreed that the nature of PSC's business relationship with REAP was undisputed, it concluded that PSC could not establish the defense on summary judgment absent a contract "or other basis of a legal right to interference." ___ S.W.3d at ___. We hold that the court of appeals erred on this issue.

---

[13] PSC also asserted that Dr. Hansen's tortious interference claim was barred because it turned on PSC's communication of "truthful information and advice" to REAP—an affirmative defense to tortious interference under the *Restatement (Second) of Torts*, which this Court has not adopted. The court of appeals rejected this theory. ___ S.W.3d at ___. The court of appeals also held that summary judgment could not be upheld on the ground of qualified privilege because PSC's summary-judgment motion did not specifically invoke the defense in its discussion of tortious interference (as opposed to its invocation on Dr. Hansen's business disparagement claim). *Id.* at ___. We do not reach these grounds for summary judgment in light of our decision on PSC's justification defense.

We have held that the affirmative defense of justification can be based on the exercise of either: (1) one's own legal rights; or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken. *Prudential*, 29 S.W.3d at 80 (citing *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996)). A defendant generally establishes justification as a matter of law "when the acts the plaintiff complains of as tortious interference are merely the defendant's exercise of its own contractual rights." *Id.* at 81. If a trial court finds that a defendant has conclusively established the justification defense by proving a legal right to interfere with a contract, the defendant's motive or good faith underlying the interference is irrelevant. *Id.* at 80; *see also Texas Beef*, 921 S.W.2d at 212 ("[W]e disavow good faith as relevant to the justification defense when the defendant establishes its legal right to act as it did."). Conversely, if a defendant cannot establish the defense as a matter of law, the defendant "can still establish the defense if the trial court determines that the defendant interfered while exercising a colorable right, and the jury finds that, although mistaken, the defendant exercised that colorable right in good faith." *Prudential*, 29 S.W.3d at 80 (citing *Texas Beef*, 921 S.W.2d at 211). The defense does not apply when the interference is by illegal or tortious means, such as misrepresentation or fraud. *See, e.g.*, *id.* at 81.

Many kinds of business relationships can be formed without a contract and nonetheless give rise to a legal right to interfere with another's contract. One such relationship is that between an agent and principal. *See, e.g.*, *Holloway*, 898 S.W.2d at 795. An agency relationship, which can be formed by oral agreement between the parties or simply by the parties' conduct, entitles the agent to act on the principal's behalf with the same force and effect as if the principal had performed the act himself. *See Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex. 1992); *see also Gaines v. Kelly*, 235

S.W.3d 179, 182 (Tex. 2007) ("An agent's authority to act on behalf of a principal depends on some communication by the principal either to the agent (actual or express authority) or to the third party (apparent or implied authority)." (citing *Hester Int'l Corp. v. Fed. Republic of Nig.*, 879 F.2d 170, 181 (5th Cir. 1989))). Further, as we have explained, assuming an agent acts within the scope of the authority the principal has bestowed upon him, a third party generally cannot hold the agent liable for tortiously interfering with a contract between the third party and the agent's principal. *Holloway*, 898 S.W.2d at 795–96.

However, Texas courts do not presume that an agency relationship exists. *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007). Rather, if the existence of an agency relationship or the extent of the authority conferred is at issue, the party making the allegation has the burden of proving it by a preponderance of the evidence. *Id.* To establish an agency relationship, one must show a manifestation of consent by the purported agent to act on the principal's behalf and subject to the principal's control, together with a manifestation of consent by the purported principal authorizing his agent to act. *Grissom*, 704 S.W.2d at 326. Thus, we must determine whether PSC presented evidence conclusively establishing the existence of an agency relationship in which PSC provided advice to REAP about the financial performance and employment of its physicians. If PSC did so, then it also conclusively established a legal right to interfere with Dr. Hansen's employment contract despite the lack of a written contract in its summary-judgment proof.

We begin our analysis by reiterating that the summary-judgment evidence depicts a web of organizations at play, all owned by Community Health Systems, Inc. That is, the undisputed evidence shows that Community Health Systems, Inc., has owned and operated the Hospital, PSC,

38

and, indirectly, REAP as subsidiaries since at least 2007. Uncontroverted evidence also shows that Community Health Systems subsidiaries, such as PSC, provide necessary operational support to REAP, an entity that has no employees or paid staff and does not maintain its own business records. Rather, representatives from PSC and the hospitals and clinics at which REAP's physicians operate report to and brief the REAP Board on financial, operational, and quality matters regarding REAP's physicians. Thus, the evidence is clear that REAP, which acts through its board of directors, does little more than hire and fire physicians.

Here, PSC asserted that it was justified as a matter of law because it had "the legal right to provide input and advice to the REAP Board regarding the employment of physicians." To support this contention, PSC relied on the deposition testimony of Leslie Luke, PSC's vice president of practice management. Luke testified that his role at PSC is to "make recommendations to the [REAP] board as far as the hiring and termination of physicians" and that his "role with REAP" is to "make recommendations to them as far as physicians who would like to be employed by REAP in terms of their salaries or compensation, in general [and] make recommendations as far as terminations."[14] He explained that since 2007, he has been responsible for "evaluat[ing] physician employment contracts [and] mak[ing] recommendations to hospital CEOs in regard to employed physicians." Luke further testified that his role at PSC is to "manage . . . the employed physician clinics . . . by analyzing their financial data, seeing how they're operating."

---

[14] Luke testified further that he has a role in advising the REAP Board during contract negotiations with physicians by "work[ing] with CEOs and REAP to recommend the terms that are on there." Luke later answered affirmatively when Dr. Hansen's counsel asked whether he would have had to make a recommendation for the hiring of a different doctor by REAP.

Luke also testified about PSC's interactions with the REAP Board, explaining that one of his employees, Ashley Bosshart, attends and keeps minutes of the REAP board meetings and that Luke himself attends those meetings in order to provide recommendations directly to the REAP Board. Luke also testified that the REAP Board can instruct him to obtain more information when necessary. Thus, Luke's testimony establishes that his primary role at PSC is to advise the REAP Board regarding the employment of physicians, including providing details about physician performance. Indeed, Luke testified that he has "direct access" to information on Dr. Hansen's collections from the third-party billing and collection provider, PPSI, and regularly receives reports from PPSI on the physicians employed by REAP. Luke explained that his basic job day in and day out is to "look at these numbers and see if these physicians are performing." Luke also testified that he was executing these duties when he was evaluating Dr. Hansen's performance at the times relevant to Dr. Hansen's lawsuit. In fact, Luke testified that he was responsible for managing the issues with Dr. Hansen's employment, including Dr. Hansen's difficulties securing cardiovascular surgical referrals, on REAP's behalf.

Finally, Luke testified about the existence of a contractual relationship between PSC and REAP under which he operates:

> Q. Let me rephrase the question so that we're clear on it and it's one question. Is there a contract between the management company and REAP as to the services - or that relates to the services the management company provides for REAP?

> A. My understanding, that there is one. I have not seen it.

We hold that PSC conclusively established an agency relationship between Luke and REAP, such that PSC has established a legal right to interfere with Dr. Hansen's employment contract. Dr.

Hansen did not challenge the evidence highlighted above. Rather, Dr. Hansen has consistently referred to Luke as "the 'financial guy' for REAP after 2007." Indeed, in arguing that Jackson was not REAP's agent after 2007, Dr. Hansen contended that "Luke assumed that role" when Community Health Systems acquired the Hospital in 2007. Thus, it is undisputed that Luke was responsible as PSC's vice president of practice management for evaluating and advising the REAP Board on matters relating to physician employment. It is also undisputed that Luke was acting in that capacity when he advised the REAP Board that it was entitled to exercise its option to terminate Dr. Hansen for excessive practice losses. In addition, Luke's "understanding" of the existence of a contract between REAP and PSC went unrefuted. Luke also testified that the REAP Board can "instruct him" to obtain additional information as necessary—establishing that Luke was subject to REAP's control. Thus, we conclude that the record does not reveal any factual dispute as to whether PSC had the legal right to provide input and advice to the REAP Board regarding the employment of physicians.

Because Dr. Hansen has not challenged the court of appeals' affirmation of the summary judgment granted on Dr. Hansen's business disparagement claim and because there is no other illegal or tortious act at issue,[15] the only question remaining is whether the justification defense does not apply because Luke exceeded the scope of his legal right.

---

[15] Dr. Hansen claims that Luke's actions were illegal because of the laws prohibiting the corporate practice of medicine. However, Luke merely provided information and recommendations to the REAP Board; he did not unlawfully terminate Dr. Hansen himself or engage in other conduct violating these statutes and regulations. *See* TEX. OCC. CODE §§ 162.0021–.0023 (stating that health organizations: (1) may not interfere with, control, or otherwise direct a physician's professional judgment; (2) must adopt, maintain, and enforce policies to ensure that employed physicians exercise independent medical judgment when providing care to patients; and (3) may not discipline the physician for reasonably advocating for patient care).

Dr. Hansen argues that there is a fact issue as to whether PSC exceeded its legal right by providing advice to REAP about "matters that were not financial" or by providing incomplete or inaccurate information. Dr. Hansen points to the following acts by PSC to support his claim that PSC exceeded the scope of its right to interfere: (1) Luke's November 2009 recommendation that REAP be prepared to terminate Dr. Hansen "because of his issues with the cardiologists" (i.e., his refusal to see patients referred by Drs. Lechin and Lammoglia); (2) Bosshart's alleged statement during the REAP board meeting in February 2010 that "Jackson, as Chief Executive Officer of the Hospital, had instructed her that REAP wished to terminate Dr. Hansen's contract because of 'clinic losses' and 'behavioral problems'"; and (3) PSC's failure to advise the REAP Board that Dr. Hansen had asked to speak to the Board concerning his dispute with the two cardiologists. Dr. Hansen also argues that Luke created a false impression of his performance in November 2009 when Luke told the REAP Board that Dr. Hansen had not worked since September because Dr. Hansen had performed a limited number of surgeries during that period.

We conclude that Luke did not exceed the scope of his legal right to provide input and advice to the REAP Board regarding the employment of physicians. Luke's testimony shows that PSC's role in advising REAP on physician employment and compensation is not limited strictly to financial information and analysis; rather, Luke's unrefuted testimony shows that PSC's duties encompass offering recommendations and consultation to the REAP Board on the hiring and termination of physicians and on existing physician contracts. These duties would naturally include PSC's right to provide explanations for its recommendations, such as Luke's statement describing Dr. Hansen's dispute with the other doctors and the fact that he had stopped taking referrals from them. As to the

42

statement by Bosshart, the uncontroverted evidence is that Bosshart was an administrative assistant whose role was limited to "send[ing] out documents that reflect decisions that have been made," such that Bosshart's statements do not constitute actionable interference. Finally, we conclude that Luke's statement to the REAP Board that, except for providing emergency assistance, Dr. Hansen had not worked from September through November 2009, did not exceed the scope of his duties at PSC. First, the gist of the statement is true—although Dr. Hansen performed a limited number of emergency procedures during that time, he was not otherwise accepting referrals from the two BCS Heart cardiologists who were responsible for generating the bulk of Dr. Hansen's client base. *Cf. Neely v. Wilson*, 418 S.W.3d 52, 63–64 (Tex. 2013) (holding that statements are not actionable for defamation or business disparagement when the statement is substantially true—when "specific statements . . . err in the details but . . . correctly convey the gist of a story"). Second, Luke's failure to convey to the REAP Board the fact that Dr. Hansen now claims he engaged in this "turf battle," as Dr. Hansen called it at the time, based on his "best medical judgment" about patient care does not render Luke's statement untrue, and we find no evidence establishing that Luke had an obligation to convey this information. We hold that PSC conclusively established that it had a legal right to interfere with Dr. Hansen's employment contract with REAP and that Luke did not exceed the scope of that right.

### c. Summary

Although the court of appeals properly held that the trial court could not grant PSC's motion for summary judgment on no-evidence grounds, the court of appeals erred by reversing the trial court's summary-judgment order based on a mistaken impression that PSC had not conclusively

43

established its justification defense. Therefore, we need not reach PSC's arguments relating to qualified privilege and privilege based on truthful information.

## V. Conclusion

We hold that REAP is entitled to summary judgment on Dr. Hansen's breach of contract claim because REAP's summary-judgment evidence conclusively establishes that REAP complied with the contractual conditions to a "without cause" termination. We further hold that the Hospital and Jackson are entitled to summary judgment on no-evidence grounds. Finally, we hold that PSC is entitled to summary judgment on its justification defense because PSC's unrefuted summary-judgment evidence establishes its legal right to advise the REAP Board regarding the employment of physicians. Accordingly, we reverse the judgment of the court of appeals and reinstate the trial court's take-nothing judgment in favor of REAP as to Dr. Hansen's breach of contract claim and the trial court's take-nothing judgment in favor of the Hospital, Jackson, and PSC as to Dr. Hansen's tortious interference with contract claims.

_____
Paul W. Green
Justice

**OPINION DELIVERED:** June 16, 2017