**AFFIRM; Opinion Filed April 20, 2018**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

---

### No. 05-16-00763-CV

---

**THE FAN EXPO, LLC, Appellant**

**V.**

**NATIONAL FOOTBALL LEAGUE, NFL ENTERPRISES, LLC, NFL NETWORK SERVICES, INC. D/B/A NFL NETWORK, NFL DIGITAL MEDIA, AND NFL.COM, Appellees**

---

**On Appeal from the 193rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-15-08119**

---

## MEMORANDUM OPINION
Before Justices Lang, Fillmore, and Schenck
Opinion by Justice Schenck

The Fan Expo, LLC ("Fan Expo") appeals the trial court's grant of summary judgment in favor of appellees National Football League ("the NFL"), NFL Network Services, Inc., NFL Enterprises, LLC, NFL.com, and NFL Digital Media (collectively, "NFL entities"), dismissing its claims. Fan Expo challenges the sufficiency of the summary judgment evidence to support judgment on the NFL's justification defense and the trial court's decision to grant the NFL leave to amend its summary judgment motion. Fan Expo also urges that fact issues exist on its claims against the NFL entities, and challenges the trial court's decision to sustain objections to Fan Expo's summary judgment evidence. We affirm the trial court's judgment. Because all issues are settled in law, we issue this memorandum opinion. TEX. R. APP. P. 47.4.

BACKGROUND

In early 2015, Fan Expo was formed to create the National Fantasy Football Convention ("NFFC"), an organization intended to facilitate NFL fan and player interaction at an event that would feature current and former NFL players, media personalities, and football experts. The NFFC's inaugural event ("Event") was planned to take place on July 10–12, 2015, at the Venetian Resort Hotel Casino ("Venetian") in Las Vegas, Nevada. Between March and May, the NFFC signed appearance agreements with approximately 60 NFL players and entered into verbal agreements with approximately 30 NFL players. Michael Fabiano (an on-air talent for NFL Network) and Desmond Purnell (a news reporter for NFL Network) also signed agreements to participate in the Event. Two producers for NFL Network's *Fantasy Live* television show, Heather Pink and Dylan Milner, communicated with Fan Expo's Executive Director Andy Alberth about Pink participating on a panel at the Event and about some of the *Fantasy Live* video production staff and on-air personalities attending the Event.

In late May 2015, a representative of an NFL team contacted Brook Gardiner, Senior Labor Relations Counsel for the NFL, to inquire whether NFL players' participation in the Event would violate the NFL's Gambling Policy. After conducting an investigation that included speaking with Alberth and reviewing the Event's advertising materials, Gardiner concluded that NFL player participation in the Event would violate the Gambling Policy because of the location of the Event at the Venetian.[1] He then contacted Sean Sansiveri, Vice President of Business and Legal Affairs for the National Football League Players' Association ("Players' Association"), to inform him that NFL Players planned to participate in the Event and that such participation would violate the NFL's Gambling Policy. Based on his own investigation, Sansiveri believed "it was reasonable

---

[1] The Gambling Policy prohibits NFL Personnel from "[p]articipating in promotional activities or other appearances at or in connection with events . . . that are held at or sponsored by casinos or other gambling-related establishments."

to say that [NFL players' participating in the Event] was a violation of the Gambling Policy." Dexter Santos, the Players' Association's Vice President of Player Services, then called several agents and player representatives to alert them that the NFL considered NFL players' participation in the Event to be a violation of the Gambling Policy and that the players could be subject to discipline by the NFL.

In July 2015, Fan Expo filed suit against the NFL, claiming tortious interference with contract and tortious interference with prospective business relationships.[2] Its original petition alleged, among other things, that the NFL caused the cancellation of the Event by falsely representing to players and NFL personnel that participation in the Event would violate the NFL's Gambling Policy. The NFL answered and asserted multiple defenses, including justification, on which it later moved for summary judgment against Fan Expo on all of its claims. That motion for summary judgment included as an attachment an affidavit from Gardiner and a copy of the Gambling Policy.

On February 8, 2016, the NFL amended its motion ("Amended MSJ") with additional evidence, including the testimony of Sansiveri. In the Amended MSJ, the NFL argued in part that its Gambling Policy prohibited participating at events held at casinos or other gambling-related establishment and that the Gambling Policy applies to all NFL Players pursuant to the Collective Bargaining Agreement ("CBA") between the Players' Association and the NFL. Two weeks later, Fan Expo amended its petition to add claims for business disparagement, fraud, breach of contract, promissory estoppel, equitable estoppel, and quasi-estoppel. Fan Expo also responded to the Amended MSJ, asserting that the NFL's motion failed to establish the NFL's legal right to interfere with Fan Expo's relationships with professional football players. According to Fan Expo, the NFL

---

[2] As discussed *infra*, Fan Expo later amended its petition to assert claims against the other NFL entities: NFL Network Services, Inc., NFL Enterprises, LLC, NFL.com, and NFL Digital Media.

relied on the existence of the CBA to establish its authority to discipline NFL players but had not offered the CBA into evidence. Four days prior to the hearing on the Amended MSJ, the NFL filed a reply, to which it attached a copy of the CBA.

After conducting a hearing at which the NFL was granted leave to file its supplemental summary judgment evidence, the trial court granted the Amended MSJ on Fan Expo's claims of tortious interference with contract and tortious interference with prospective business relationships and signed orders sustaining the NFL's objections and overruling Fan Expo's objections to the evidence. Fan Expo later amended its petition to assert claims against the other NFL entities and to assert claims based on its agreements with Fabiano and Purnell and its discussions with the *Fantasy Live* team.[3] The NFL and the NFL entities moved for and were granted summary judgment ("Second MSJ") on Fan Expo's claims not disposed of by the order on the Amended MSJ. The trial court signed a final judgment ordering that Fan Expo take nothing from the NFL entities.

**DISCUSSION**

## I.     The NFL's Justification Defense

In its first set of issues, Fan Expo challenges the trial court's decision to grant the NFL's Amended MSJ, in which the NFL moved for traditional summary judgment and sought to establish the affirmative defense of justification on Fan Expo's claims of tortious interference with contract and prospective business relationships. Fan Expo argues the NFL failed to conclusively prove its justification defense because it failed to explain how or why it had the authority to enforce the Gambling Policy.

---

[3] In this petition, Fan Expo asserted the following claims: 1) business disparagement against the NFL, 2) fraud against the NFL, 3) fraud by non-disclosure against the NFL entities, 4) negligence against the NFL entities, 5) negligent misrepresentation against the NFL entities, 6) breach of contract and anticipatory breach of contract against the NFL entities, 7) tortious interference with contracts against the NFL, 8) tortious interference with prospective business relationships against the NFL, 9) promissory estoppel against the NFL entities, and 10) equitable estoppel and quasi-estoppel against the NFL entities.

We review a trial court's order granting summary judgment de novo, taking as true all evidence favorable to the nonmovant, and indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 680 (Tex. 2017). To prevail on a traditional motion for summary judgment, the movant must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Id.* at 681. Summary judgment granted on the basis of an affirmative defense will be affirmed only if the record establishes that the movant conclusively proved all elements of its affirmative defense as a matter of law. *Thomas v. Omar Investments, Inc.*, 156 S.W.3d 681, 683 (Tex. App.—Dallas 2005, no pet.). An issue is conclusively established if reasonable minds could not differ about the conclusion to be drawn from the facts in the record. *Hansen*, 525 S.W.3d at 681.

The affirmative defense of justification can be based on the exercise of one's own legal rights or a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken. *Id.* at 697. A defendant generally establishes justification as a matter of law when the acts the plaintiff complains of as tortious interference are merely the defendant's exercise of its own contractual rights. *Id.* If a trial court finds that a defendant has conclusively established the justification defense by proving a legal right to interfere with a contract, the defendant's motive or good faith underlying the interference is irrelevant. *Id.* Conversely, if a defendant cannot establish the defense as a matter of law, the defendant can still establish the defense if the trial court determines that the defendant interfered while exercising a colorable right, and the factfinder finds—or in the context of summary judgment, a defendant conclusively establishes—that, although mistaken, the defendant exercised that colorable right in good faith. *See id.* The defense does not apply when the interference is by illegal or tortious means, such as misrepresentation or fraud. *Id.*

In the Amended MSJ, the NFL set forth that it has a Gambling Policy and attached a copy as an exhibit. The Gambling Policy itself states that it "applies to all NFL Personnel and is intended clearly to define permissible and prohibited activities, and to serve as a guide to promote compliance" and that it defines "NFL Personnel" to include "[a]ll players." The Gambling Policy prohibits NFL Personnel from "[p]articipating in promotional activities or other appearances at or in connection with events . . . that are held at or sponsored by casinos or other gambling-related establishments." Further, the Gambling Policy provides that "[v]iolations of this policy . . . will subject the involved . . . person to appropriate disciplinary action by the Commissioner." The NFL also included evidence of advertisements of the Event at the Venetian and a copy of the agreement in which Fan Expo contracted with the Venetian to host the Event. We conclude the foregoing evidence is sufficient to prove the NFL's justification defense and to establish its authority to enforce the Gambling Policy.

We further conclude that by communicating to the Players' Association and NFL players' agents its determination that participation in the Event would violate the Gambling Policy, the NFL was exercising its right to communicate with another party to whom it had a contractual and business relationship similar to the situation in a prior decision from this Court. *See AT&T Corp. v. Sw. Bell Telephone Co.*, No. 05-99-00186-CV, 2000 WL 14711, at *4 (Tex. App.—Dallas Jan. 11, 2000, no pet.) (not designated for publication). In *AT&T*, we concluded that a client's inquiry of its auditor as to nature of the work the auditor was performing for the client's rival was the exercise of the client's legal right. *See id*.

Fan Expo attempts to distinguish this opinion by noting that in *AT&T*, the communication at issue was merely an "inquiry" from AT&T's CEO, not a threat of discipline, and that the relationship at issue was one between accountants and clients, giving rise to legal rights of confidentiality independent of contractual rights. *See id.* We disagree. Our decision explicitly

took as true that the phone call was intended to interfere with the rival's relationship with the auditor and thus any distinction between "inquiry" and "threat" is not borne out by our prior analysis. *See id.*, at *4. Additionally, while our opinion cited the evidence of the two decade relationship between the client and the auditor and that the relationship involved access to the client's confidential and proprietary business information, nothing in our analysis depended upon any legal rights of confidentiality that arise from the relationship between an auditor and its client. *See id.* Instead, we conclude that the NFL's communications with the Players' Association were similar in all material respects to those at issue in *AT&T*. *See id.*

Fan Expo contends that only the CBA between the NFL and the Players' Association could support the NFL's justification defense. In the Amended MSJ, the NFL argued it had a valid right to enforce its Gambling Policy, "which applies to NFL players pursuant to the Collective Bargaining Agreement." Additionally, the first exhibit to the Amended MSJ was an affidavit from Gardiner in which he stated as follows:

> In my role as Senior Labor Relations Counsel for the NFL, I am charged with the enforcement of the Gambling Policy with respect to NFL players. The Gambling Policy is enforceable against all current NFL players through the collective bargaining agreement between the NFL and the National Football League Players' Association. The Gambling Policy was in effect at all times relevant to this lawsuit.

According to Fan Expo, because the NFL referred to the CBA as the mechanism through which its Gambling Policy was enforceable against NFL players, and because the CBA was not attached as an exhibit to the Amended MSJ, the Amended MSJ did not in fact conclusively prove the NFL's justification defense. However, the foregoing argument ignores the text of the Gambling Policy itself and the unobjected-to summary judgment evidence the NFL attached to the Amended MSJ,

including Sansiveri's deposition testimony as counsel for the Players' Association as to his understanding that the players were bound by the Gambling Policy.[4]

Even assuming the CBA was required to be included as part of the summary judgment evidence in order to establish the NFL's justification defense, the NFL properly submitted a copy of the CBA with leave from the trial court to do so. Fan Expo complains that the trial court abused its discretion by admitting the CBA and other evidence filed four days before the summary judgment hearing. A trial court, however, enjoys broad discretion to allow evidence to be filed after the hearing on the motion and before summary judgment is rendered. *See DMC Valley Ranch, L.L.C. v. HPSC, Inc.*, 315 S.W.3d 898, 902 (Tex. App.—Dallas 2010, no pet.). Although Fan Expo argues it was harmed by the late admission of the CBA, the record reflects that Fan Expo introduced the document as an exhibit to a deposition conducted on January 21, 2016, and thus Fan Expo was aware of and had access to the CBA weeks before the NFL filed its Amended MSJ on February 8, 2016. On these facts, we conclude the trial court did not err or abuse its discretion by granting the NFL leave to file evidence filed four days before the summary judgment hearing.

Next, Fan Expo argues that the NFL's legal right to establish its justification defense was created by the CBA and could be enforced only pursuant to Article 46 of the CBA, which it urges the NFL did not follow. The Gambling Policy provides that "[v]iolations of this policy constitute conduct detrimental to the League." Article 46 of the CBA provides that "[a]ll disputes . . . involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public confidence in, the game of professional football, will be processed exclusively as follows: the Commissioner will promptly send written notice of his action to the player, with a copy to the [Players' Association]." Fan Expo contends that because there is

---

[4] Additionally, Fan Expo challenges the trial court's decision to deny its objections to portions of Gardiner's affidavit, which was an exhibit to the Amended MSJ. Because we conclude the objected-to evidence was not necessary to establish the NFL's justification defense, we need not address these arguments. *See* TEX. R. APP. P. 47.4. Similarly, we conclude that any new arguments raised in the NFL's reply in support of the Amended MSJ are not necessary to establish the justification defense and as such need not be addressed. *See id.*

evidence the Commissioner was not involved in the NFL's decision to contact the Players' Association regarding the Event, the NFL failed to establish a contractual legal right to support its justification defense.

Taken to its logical conclusion, Fan Expo appears to argue that the only way the NFL could exercise any rights related to the Gambling Policy would be to wait until it was violated and then only after the Commissioner made the decision to take enforcement action. However, we need not follow Fan Expo's argument to its logical conclusion because the provision in question, Article 46, addresses the procedures for disciplining players for violations. In this instance, while the NFL had concluded that participation in the Event would constitute a violation of the Gambling Policy, its communications with the Players' Association were not efforts to discipline players but to avoid the need to do so.

Finally, we address Fan Expo's argument that the evidence established the Event was not going to be held at a casino, and alternatively that the Gambling Policy is ambiguous. The Gambling Policy prohibits NFL Personnel from "[p]articipating in promotional activities or other appearances at or in connection with events . . . that are held at or sponsored by casinos or other gambling-related establishments." Regardless of whether the Event was scheduled to be held at a casino, the evidence clearly established the Event was to take place at the Venetian. The Venetian Resort Hotel Casino is clearly a "gambling-related establishment." Sansiveri of the Players' Association agreed that there was no arguing the location was not associated with a casino. Additionally, the Event's marketing materials advertised that, "The Venetian . . . features some of the word's premier shows, shopping, service, and of course, *on-site gaming opportunities*." Fan Expo contends the phrase "gambling-related establishment" is potentially subject to different meanings, postulating that "examples abound where an event could go forward though the venue was part of a larger complex or structure that contained a casino." However, an ambiguity does

not arise merely because a party offers an alternative conflicting interpretation, but only when the contract is actually susceptible to two or more relevant, reasonable interpretations. *See Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017).

We overrule Fan Expo's first set of issues.

## II.     Independently Tortious Conduct

In its second set of issues, Fan Expo argues the Amended MSJ could not have resolved the fraud and business disparagement claims because Fan Expo asserted them after the NFL filed its Amended MSJ.   Fan Expo urges that the trial court erred in granting the NFL's Amended MSJ because Fan Expo asserted or at least established a fact-issue as to whether the NFL had engaged in independently tortious conduct and because independently tortious conduct cannot ever be the basis for a justification affirmative defense.

In the Amended MSJ, the NFL moved for traditional summary judgment on two grounds to address the two claims Fan Expo had asserted: (1) that the NFL was justified in enforcing its own gambling policy, precluding Fan Expo's tortious interference with existing contract; and (2) that Fan Expo cannot establish that the NFL committed an independently tortious act, thus precluding its claim for tortious interference with prospective relations.  Fan Expo then filed an amended petition simultaneous to its response to the Amended MSJ to assert the following claims: 1) business disparagement against the NFL, 2) fraud against the NFL, 3) fraud by non-disclosure against the NFL and the NFL entities, 4) negligence against the NFL and the NFL entities, 5) negligent misrepresentation against the NFL and the NFL entities, 6) breach of contract and anticipatory breach of contract against the NFL and the NFL entities, 7) promissory estoppel against the NFL and the NFL entities, and 8) equitable estoppel and quasi-estoppel against the NFL and the NFL entities.  After the trial court granted the Amended MSJ, the NFL and the NFL

–10–

entities filed the Second MSJ, which asserted the order granting the Amended MSJ barred Fan Expo's claims for business disparagement, fraud, and negligent misrepresentation.

We first address Fan Expo's complaint that the order granting the Amended MSJ could not bar its claims for business disparagement and fraud because those two claims were not specifically addressed in the Amended MSJ. Generally, summary judgment cannot be granted on a cause of action not raised in the summary judgment motion. *Burt v. Harwell*, 369 S.W.3d 623, 625 (Tex. App.—Dallas 2012, no pet.). However, summary judgment may be proper on claims not addressed in the summary judgment proceeding, if the grounds asserted in the original motion nevertheless show that the plaintiff could not recover from the defendant on causes of action pleaded after the original motion for summary judgment was filed. *Id.* The conduct Fan Expo asserted as the basis for its fraud and business disparagement claims was that the NFL published and represented that (a) the Event was being held at a casino or gambling-related establishment, (b) the Event was sponsored by a casino or a gambling-related establishment, (c) the Event violated the NFL's gambling policy, and (d) the NFL players making an appearance at the Event would be disciplined. Both fraud and business disparagement claims require a finding of a false statement. *See Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015); *In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015). In its Amended MSJ, the NFL argued Fan Expo had failed to allege an independently tortious act by the NFL, that the complained of statements were true, and that true statements could not support any allegation of an independently tortious act by the NFL. We conclude the Amended MSJ was sufficiently broad to cover the claims of fraud and business disparagement so as to pretermit the granting of the subsequent motion.[5] *See Burt*, 369 S.W.3d at 625.

---

[5] In a separate issue, Fan Expo argues the trial court erred in granting the NFL entities' Second MSJ on Fan Expos fraud and business disparagement claims. In light of our conclusion above, we need not address this separate issue. *See* TEX. R. APP. P. 47.4.

–11–

We next address Fan Expo's assertions that it established a fact-issue as to whether the NFL had engaged in independently tortious conduct and that independently tortious conduct cannot ever be the basis for a justification affirmative defense. The supreme court recently affirmed that the justification defense does not apply when the defendant's interference is by illegal or tortious means, such as misrepresentation or fraud. *Hansen*, 525 S.W.3d at 697. Accordingly, we will examine whether Fan Expo established a fact-issue as to whether the NFL had engaged in independently tortious conduct.

As discussed above in the first set of issues, the NFL's evidence established the truth of the first and third of the four allegedly false statements. Fan Expo has not identified any evidence to establish the NFL communicated that the Event would be sponsored by the Venetian consistent with the second allegedly false statement. And, the Gambling Policy itself provides that players who violate the Gambling Policy are subject to discipline, thus establishing the truth of the fourth allegedly false statement. Based on the foregoing, we conclude Fan Expo failed to establish that the NFL's conduct was independently tortious so as to preclude the NFL from establishing its affirmative defense of justification. *Cf. Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 83 (Tex. 2000) (holding plaintiff did not establish its justification defense as a matter of law where there was some evidence plaintiff caused defendant injury through tortious conduct).

We overrule Fan Expo's second set of issues.

### III. Fan Expo's Breach of Contract and Promissory Estoppel Claims

In its third set of issues, Fan Expo challenges the trial court's summary judgment dismissal of its breach of contract and promissory estoppel claims, asserting that it raised a fact question on whether a valid oral contract existed with the *Fantasy Live* team. Fan Expo also urges that there was sufficient evidence to allow a jury to find that Fabiano and Purnell made agreements on behalf of the NFL, and not in their individual capacities.

In order to establish the existence of a valid contract, there must be evidence of (1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Thornton v. Dobbs*, 355 S.W.3d 312, 316 (Tex. App.—Dallas 2011, no pet.). Further, to be enforceable, a contract must define its essential terms with sufficient detail to allow a court to determine the obligations of the parties. *Crips Analytical Lab, L.L.C. v. Jakalam Props., Ltd.*, 422 S.W.3d 85, 89 (Tex. App.—Dallas 2014, pet. denied). "Essential terms" of a contract include time of performance, price to be paid, work to be done, service to be rendered, or property to be transferred. *Id.* When an agreement leaves essential terms open for future negotiation, it is not binding and cannot support a claim of breach. *Id.* The parties must have a "meeting of the minds" and must communicate consent to the terms of the agreement. *Id.* In determining whether the evidence supports a meeting of the minds, we apply the requisite objective standard of what the parties said and did rather than their subjective state of mind. *Id.*

In support of the existence of an oral contract between itself and the *Fantasy Live* team, Fan Expo points to the following evidence:

- Emails between Carmen Dukes, Director of Content, and Tom Brady, Vice President of Social Media and Emerging Programing for the NFL, regarding the promises of Pink and Milner to participate in the Event in exchange for permission to gather video, written, oral, and other content at and use content from the Event and for credentials and discounted hotel room rates.

- An affidavit from Alberth regarding his discussions as a Fan Expo representative with *Fantasy Live* producers Milner and Pink for "Milner to have the NFL Fantasy Live production team come and film the event and gather content" and for Pink to "serve as speaker on one of the panels at the event." He stated that "[i]n return, the NFL Fantasy Live team would be given media credentials, guaranteed player access, and thus opportunities to create content for the NFL's various media platforms."

- Deposition testimony from Dukes regarding her understanding of what was the benefit to the "team" in gathering content at the Event: the ability to gather interview content from players that were part of the Event that they could then publish on the *Fantasy Live* show and on their "fantasy platform."

–13–

- A content plan created by Milner that specified a range of interviews, promotional videos from 10-15 players, which members of the *Fantasy Live* would attend, budget, what days they would be attending, and where the Event would be held.

- An email from Milner to Alberth in which Milner states he was working on a content plan that would need to be approved "before we can commit to anything."

- Deposition testimony of Milner regarding the content plan he submitted to Dukes for her approval. He also testified that Dukes approved Pink to appear at the Event and that she approved *Fantasy Live*'s attendance at the Event.

- Emails between Milner and other NFL personnel about what the *Fantasy Live* team planned to do at the Event: interviews and man-on-the-street segments, and that they would set up on a fake football field.

- An email from Milner to Pink and other members of the *Fantasy Live* team informing them that they would be "backing out" from the Event.[6]

Fan Expo argues the foregoing evidence establishes the *Fantasy Live* team, including Pink and Milner, agreed to participate in the Event in exchange for permission to gather and use content from the Event, as well as "comped" credentials and discounted hotel room rates. Further, Fan Expo urges that all parties shared an understanding as to the content the *Fantasy Live* team would receive from participating in the Event, the dates they would attend the Event, the location of the Event, and which members of the team would attend and participate. Finally, Fan Expo relies on emails and deposition testimony from Milner to establish that he had the actual and apparent authority to enter into an agreement on behalf of the NFL and that he did so.

We initially note that Fan Expo does not set forth how the evidence establishes an offer and acceptance, an exchange of consideration, or a meeting of the minds between the parties. *See Thornton*, 355 S.W.3d at 316. Moreover, even accepting Fan Expo's arguments regarding Milner's authority to enter into a contract on behalf of the NFL as true, the evidence is not sufficient to establish the essential terms of the agreement with sufficient definiteness. Rather, the

---

[6] As the NFL points out, the trial court granted its objections to some of this evidence and Fan Expo has not challenged these decisions on appeal. Regardless, even if this evidence were part of the summary judgment record, it does not affect our conclusion.

parties appear to have merely identified the benefits that might materialize from the Event. *See Crips Analytical Lab*, 422 S.W.3d at 89. Milner and Alberth agreed that the *Fantasy Live* team would receive credentials, but Alberth's affidavit did not indicate the credentials would be "comped," and Milner appeared to still have questions as to what access those credentials would grant them. Additionally, Alberth's affidavit made no mention of discounted hotel room fees. Alberth and Milner also appear to have agreed that the *Fantasy Live* team would gather content, but there was no specificity as to how many interviews or which players would even be present at the Event. Nor was there any definite plan for how or if that content would be used by the *Fantasy Live* team. In sum, none of the evidence supports a conclusion that the parties made a commitment enforceable as a contract. *See Johnston v. Kruse*, 261 S.W.3d 895, 898 (Tex. App.—Dallas 2008, no pet.) (contract that does not require party to furnish consideration, or oblige him to do anything, lacks mutuality, is unilateral, and is unenforceable). Based on the foregoing analysis, we conclude the trial court did not err in granting summary judgment on Fan Expo's breach of contract and promissory estoppel claims related to the *Fantasy Live* team.

We next address whether there was any evidence that Fan Expo's agreements with Fabiano and Purnell were binding on the NFL, rather than simply Fabiano and Purnell in their individual capacities.[7] Fan Expo relies on the following evidence to assert that a genuine issue exists with respect to that question. The NFL Network advertises both Fabiano and Purnell on its website as a senior fantasy analyst and reporter, respectively. Both men have NFL email addresses, and there was some evidence that both men sought and obtained approval from NFL staff to participate in the Event. Fabiano signed his contract with Fan Expo with the title "Senior Fantasy Analyst."

---

[7] Although Fan Expo failed to set forth in arguments or evidence in support of this issue, the fact section of Fan Expo's brief points to some evidence in the record, as does Fan Expo's response to the NFL entities' Second MSJ. *See* TEX. R. APP. P. 38.9.

The summary judgment record also includes Fabiano's affidavit that he is an independent contractor at the NFL Network offices, not a regular employee of any NFL entity, that his agreement with the NFL permits him to take personal business opportunities subject to approval from the NFL Network, and that his agreement with Fan Expo was one such personal business opportunity to which none of the NFL entities was a party. The record contains a copy of Fabiano's contract, which identifies him as an independent contractor and disclaims employment by the NFL and includes an attached schedule that prohibits Fabiano from advertising gambling-related activities and requires him to obtain approval from the NFL Network for personal business opportunities, defined as rendering services in connection with any promotion of any products, services, brands, or charities. The record also includes Purnell's contract, which has similar approval provisions as Fabiano's contract.

The contracts and Fabiano's affidavit thus establish that the approval Fabiano and Purnell received was consistent with their contractual obligations and not indicative of the individuals acting in any representative capacity for any NFL entity. Further, in the Second MSJ, the NFL entities pointed out that neither Fabiano's nor Purnell's agreement with Fan Expo mentioned any of the NFL entities as a party, nor did either reflect any consideration for or obligation from any of the NFL entities. As for any argument regarding Fabiano's apparent authority to enter into an agreement on behalf of any NFL entity based on his signing his title to his agreement, this Court has held that in order to establish a party signed as an agent, the plaintiff must prove that the party indicated that he was signing in a representative capacity and identified his principal. *See Wright Grp. Architects-Planners, PLLC v. Pierce*, 343 S.W.3d 196, 200–01 (Tex. App.—Dallas 2011, no pet.).

Based on the foregoing, we conclude the trial court did not err in granting summary judgment on Fan Expo's breach of contract and promissory estoppel claims related to the agreements with Fabiano or Purnell.

We overrule Fan Expo's third set of issues.

## IV.    Fan Expo's Summary Judgment Evidence

In its final set of issues, Fan Expo challenges the trial court's decision to grant the NFL's objections to five categories of Fan Expo's summary judgment evidence.

We review a trial judge's exclusion of evidence for abuse of discretion. *Pinnacle Anesthesia Consultants, P.A. v. Fisher*, 309 S.W.3d 93, 107 (Tex. App.—Dallas 2009, pet. denied). Unless the trial court's erroneous evidentiary ruling probably caused the rendition of an improper judgment, we will not reverse the ruling. *Id.*

First, Fan Expo argues the trial court erred by sustaining objections to evidence of events similar to the Event that were attended by or promoted by NFL players without any punishment or threats of punishment by the NFL.[8]   It urges that the fact that the NFL has not enforced the Gambling Policy in relation to similar events is highly probative of whether the NFL believed participation in the Event would violate the Gambling Policy.

Second, Fan Expo argues the trial court erred by excluding the affidavit of Howard Skall, a former employee of the Players' Association and player agent handling the marketing of professional football players.  In his affidavit, Skall testified regarding his understanding of the Gambling Policy based on events he had witnessed, which had not—to his knowledge—resulted

---

[8] Fan Expo appears to have offered this evidence in response to both the Amended MSJ and the NFL entities' Second MSJ, but not objected to the trial court's rulings made in association with the NFL entities' Second MSJ.  We are aware that prior authority from this Court requiring a party's objection to a trial court's ruling sustaining an objection to the party's summary judgment evidence in order to preserve any complaint regarding the trial court's ruling has recently been criticized. *See Miller v. Great Lakes Mgmt. Serv., Inc.*, No. 02-16-00087-CV, 2017 WL 1018592, at *2 n.4 (Tex. App.—Fort Worth Mar. 16, 2017, no pet.).  Regardless, in light of our conclusion on this evidence, we need not decide whether Fan Expo properly preserved these arguments.

in discipline by the NFL.  Fan Expo asserts that this evidence "showed the NFL does not and has never taken the position regarding the Gambling Policy it took with regards to the [Event]."

Third, Fan Expo argues the trial court improperly excluded statements from NFL employees and agents.  Fan Expo urges that these statements establish the NFL approved the attendance of its employees as the Event, knew the Event was held at the Venetian, backed out of agreements for its media personalities to attend, described the NFL's understanding of the Gambling Policy, and described the NFL's tortious interference by contacting players.

Even assuming the trial court erred by excluding these three categories of evidence, Fan Expo does not argue how the exclusion of this evidence probably caused the rendition of an improper judgment.  *See Fisher*, 309 S.W.3d at 107.  Put another way, Fan Expo does not argue how this evidence shows a genuine issue of material fact exists or that the NFL entities were not entitled to judgment as a matter of law.  *See Hansen*, 525 S.W.3d at 680.  Even if the NFL had permitted attendance at other events or if certain NFL staff or the NFL itself did not initially object to the event at the Venetian, the question here was whether the NFL conclusively established the justification defense by proving a legal right to interfere with a contract.  *See id.* at 697.

Fourth, Fan Expo asserts the trial court erred by excluding the affidavit of its expert witness, Dan Reaser.  In his affidavit Reaser, set forth his opinion based on his experience in the commercial gaming industry that the convention space at the Venetian was not a "casino" under Nevada law and that, absent a permit from the Nevada State Gaming Control Board—which it was unlikely to grant given the plans to include minors at the Event—no gaming operations would have been legal in that same space.  Even assuming such evidence was relevant to establish whether the Venetian was a "casino" under the Gambling Policy,[9] it did not exclude the Venetian as not a

---

[9] *See United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007) (discussing expert opinion on question of law); *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) ("Moreover, allowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant.").

"gambling-related establishment" under the Gambling Policy. Thus, even assuming any error in excluding this evidence, we conclude the exclusion of this evidence did not cause the rendition of an improper judgment. *See Fisher*, 309 S.W.3d at 107.

Finally, Fan Expo asserts broadly that the NFL's other objections are equally meritless but does not identify any specific evidence to establish a genuine issue of material fact or otherwise establish the trial court's judgment was improper. *See Hansen*, 525 S.W.3d at 680. In light of our disposition of the first four categories of evidence, we need not address this argument any further. *See* TEX. R. APP. P. 47.4.

We overrule Fan Expo's final set of issues.

### CONCLUSION

We affirm the trial court's judgment.

/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

160763F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

THE FAN EXPO, LLC, Appellant

No. 05-16-00763-CV      V.

NATIONAL FOOTBALL LEAGUE, NFL
ENTERPRISES, LLC, NFL NETWORK
SERVICES, INC. D/B/A NFL
NETWORK, NFL DIGITAL MEDIA,
AND NFL.COM, Appellees

On Appeal from the 193rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-15-08119.
Opinion delivered by Justice Schenck,
Justices Lang and Fillmore participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

It is **ORDERED** that appellees NATIONAL FOOTBALL LEAGUE, NFL
ENTERPRISES, LLC, NFL NETWORK SERVICES, INC. D/B/A NFL NETWORK, NFL
DIGITAL MEDIA, AND NFL.COM recover their costs of this appeal from appellant THE FAN
EXPO, LLC.

Judgment entered April 20, 2018.