# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00845-CV

---

**Fred Lupfer and Advanced Public Insurance Adjusters, LLC, Appellants**

**v.**

**James R. "Jim" Beneke and The Beneke Company, Appellees**

---

### FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-18-003987, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Fred Lupfer and Advanced Public Insurance Adjusters, LLC (collectively, Lupfer) appeal from the trial court's orders granting summary judgment in favor of James R. "Jim" Beneke and The Beneke Company (collectively, Beneke). We affirm the trial court's grant of summary judgment.

## PROCEDURAL AND FACTUAL BACKGROUND

Gerald Anderson owns and operates the Juniper Cove Marina (collectively, Anderson), in Hill County, near Hillsboro, which was damaged by a tornado on January 15, 2017. On January 17, he signed a contract with Lupfer, a public insurance adjuster (PA),[1] under which Lupfer was to provide PA services in exchange for ten percent of any insurance settlement (the Lupfer contract). The contract includes a statutorily required provision

---

[1] A public insurance adjuster is paid to negotiate on behalf of an insured a claim for property loss or damage with an insurance company. *See* Tex. Ins. Code § 4102.001(3).

that states, "The insured may cancel this contract by written notice to the public insurance adjuster within 72 hours of signature for any reason." *See* Tex. Ins. Code § 4102.103(b) (PA contract "must contain a provision allowing the client to rescind the contract by written notice . . . within 72 hours of signature"). Despite that provision, Lupfer began work immediately, meeting for several hours on January 17 and 18 with Anderson and Ron Murchek, an adjuster for Anderson's insurer based in Denton, and assessing damage to the marina.

According to Lupfer, he had begun to finalize an estimate of damages when, on the morning of January 19, he received an email from Anderson cancelling the contract. Lupfer responded that the cancellation was "a huge disappointment, but I respect your decision," and asked Anderson to consider meeting with him if the insurance company provided a low initial estimate. Unbeknownst to Lupfer, Anderson had called Beneke, another PA, on the afternoon of January 18, while Lupfer was meeting with Murchek, and minutes after he sent his cancellation email, Anderson contacted Beneke to say he had cancelled the Lupfer contract, signing a contract with Beneke on the afternoon of January 20. The claim ultimately took about two years to close, with Beneke acting as PA.

Lupfer initially sued Beneke, Anderson, and the marina in Hill County, where the marina is located, but settled with Anderson and the marina. He then nonsuited that proceeding and filed this suit against Beneke in Travis County, where Beneke lives and does business, alleging claims for tortious interference with an existing contract.[2] He also pled in the refiled suit that Anderson had waived his right to terminate the Lupfer contract "in accordance with its

---

[2] In the alternative to his tortious-interference claim, Lupfer alleged common-law fraud, constructive fraud, and conspiracy. Those claims were dismissed by an earlier order granting partial summary judgment in Beneke's favor, and Lupfer only complains of the trial court's dismissal of his claim for tortious interference. We thus only discuss arguments and evidence relevant to that claim.

2

terms and Section 4102.103(b) of the Texas Insurance Code"; that Anderson was "estopped by the doctrine of equitable estoppel, quasi-estoppel from terminating the agreement"; and that "a 'unilateral contract' and non-terminable contract was established" by Lupfer's "immediate and substantial performance under the agreement, within the 72-hour termination period." Beneke filed a motion for traditional and no-evidence summary judgment, asserting that Lupfer could not produce evidence that Beneke had willfully and intentionally interfered with the Lupfer contract or that any such acts caused harm to Lupfer; that even if Beneke had urged Anderson to cancel the contract, a fact he denied, inducing Anderson to do something he had a right to do under the contract is not actionable; and that there was no evidence to support Lupfer's arguments that the contract should be viewed as an "at-will" or unilateral contract or that Anderson had waived the right to cancel or was estopped from asserting that right.

As evidence, the parties attached excerpts from the depositions of Lupfer, Anderson, Murchek, and Beneke; portions of Anderson's phone records showing his calls to Lupfer, Beneke, and Murchek between January 15 and 24; and two declarations by Lupfer. The parties also attached various emails, including the following, all sent on January 19:

- Anderson's cancellation email, received by Lupfer at 8:39 a.m., stating, "We believe that your knowledge of our marina and RV/Cabin rental business is not as thorough as we require for your services as a Public Adjuster."

- Anderson's 8:43 a.m. email to Murchek saying, "I have terminated the contract with [Lupfer] effective today. I will advise you later if Matt with [Beneke] will be traveling to Denton today."

- Anderson's 8:50 a.m. email to Beneke stating, "I have officially terminated the engagement with [Lupfer]. I look forward to working with you and Matt in the early stage of handling our latest disaster of 1/15/17."

- Beneke's 9:23 a.m. response, "Thanks, Jerry. Matt is leaving here about 11:00, so he should be there by 2:00ish to take a look around. If you have your current policy as a PDF, please send it to me."

3

Lupfer's handwritten notes, which he prepared within days of the contract's termination, state that on January 16, he drove to the area affected by the previous day's tornado and approached Anderson to explain what a PA could do for him. Anderson had worked with a PA in the past and said he would think about whether he wanted Lupfer's assistance. At about 10:00 a.m. on January 17, Anderson called to say he wanted to hire Lupfer. Lupfer went to the marina at about noon, and discussed with Anderson the claim process and using an engineer named Roger Otis "to assist with the docks." Anderson gave Murchek's name to Lupfer and signed the Lupfer contract. After he and Lupfer looked at a layout of the marina, Lupfer "walked the property to get a sense of the extent of the damage and to mentally formulate a plan." The notes indicate that Lupfer spent about three hours at the marina on January 17 and about an hour afterwards making appointments for the next day with Murchek and Otis, as well as calling Ray Choate, another PA, to ask him to assist Lupfer "due to the size of the claim." On January 18, Lupfer returned to the marina at about 8:15 a.m. When Murchek arrived at about 9:15, he, Lupfer, and Anderson discussed the claim and the insurance policy, but "the information was limited because [Anderson] did not have his policy because of the storm and [Murchek] had not received a copy from the company yet because we moved so fast." Lupfer and Murchek inspected the property until about 11:00 a.m., when Otis and Choate arrived, and the four spent about six hours walking "every dock from end to end. Inspecting every part." Lupfer wrote that he and Murchek "established the scope on all properties except the boats that were on the policy" and met with Choate and Anderson to discuss the findings and "how [they] had agreed on scope for most items." Lupfer's notes indicate that he spent about eleven hours on the marina claim on January 18 and that he made some phone calls the next morning before receiving Anderson's cancellation notice at 8:39 a.m.

4

Lupfer acknowledged in his deposition that his contract included the statutorily mandated cancellation provision and that the provision means that "they have 72 hours for which to cancel the contract," which can be cancelled "for any reason." Lupfer also testified that it is allowable, if unethical, for a PA to encourage an insured to cancel another's contract within the seventy-two-hour cancellation window, saying, "Sure, yes, you can. If you don't have ethics, yes." Lupfer acknowledged that Anderson cancelled the contract within seventy-two hours of signing it and said he thought that Anderson had contacted Beneke, not the other way around, and that Anderson had done so on the urging of his attorney, Sydney Hewlett. Lupfer believed that Anderson had decided to hire Beneke by about 3:45 p.m. on January 18, when he called Beneke while Lupfer was meeting with Murchek. Other than that call with Beneke,[3] Lupfer was not aware of any other discussions between the two men on January 18.

Lupfer agreed that if Beneke did not have knowledge of the Lupfer contract, he could have properly solicited Anderson's business. Lupfer was unaware of any evidence that Beneke knew about the contract when Anderson contacted him, and when asked what evidence he had that Beneke knew or should have known about the Lupfer contract, he said, "I don't know it for a fact," and agreed that he was "speculating as to that." Lupfer also conceded that he could not point to evidence that Beneke had any actual knowledge of the Lupfer contract that could show that he "solicited services improperly." Lupfer testified that Beneke later told him that when Anderson called on January 18, Beneke informed him "that he needed to cancel—he needed to be out of [the Lupfer] contract before he could initiate a contract with him."

---

[3] Anderson actually called Beneke twice because the conversation was interrupted when the call dropped.

Lupfer said that he had performed more than sixteen hours of work on the claim and that the work was "substantially completed" by the time Anderson sent his cancellation notice. Lupfer explained that although the work was "not nearly completed," he and Murchek had reached an agreement on scope, which is "the most substantial part of the claim." He estimated that the work was "50 to 60 percent" complete, that it would probably have taken another thirty to forty hours "to get to a reasonable point of releasing the majority of the money," and that "over the two-year term, I mean, I could put another 60 to 70 hours in it."

In Lupfer's declarations, he asserted that when he reviewed the contract with Anderson, Anderson did not want Lupfer to wait until the cancellation period had passed to begin work "because he wanted the Marina to be able to repair and reopen as quickly as possible. He asked me to begin the work immediately and obtain payment as soon as possible. I immediately began work on the project at his request." Lupfer said, "I understood him to say and to mean that he would not rely on the 72 hour termination right."

Anderson testified that he started having concerns about Lupfer's experience after his wife did a background check and found that Lupfer "had been a realtor at some point; something to do with home building. . . . But there was no website. It appeared he didn't have an office. And so she wasn't real pleased with my making the decision without doing more investigative work on him and his experience levels." In addition, Anderson said, "I spent the next two or three hours making my own process, if you would, decisions, and I was not pleased with what I observed." He said he decided not to use Lupfer because of "what [Lupfer] hadn't done," explaining that when he watched Lupfer on January 18, he saw Lupfer do "[n]othing that I knew of. No photos. No notes." In addition, Anderson spoke to other people Lupfer had met with at the marina, and "there was nothing that anybody could speak of on his behalf in a

6

positive way." Anderson said that he called Beneke at 1:47 p.m. on January 18 "[t]o find out if he's available. And he was." He testified that Beneke said that the next day, one of his associates, Matt Thannisch, would be in Denton, where Murchek was based, and that Thannisch "might be available if we decided to bring on Beneke and company."

At about 6:30 p.m. on January 18, Anderson spoke to Murchek and said he was considering terminating the Lupfer contract and hiring Beneke instead. Asked whether he had already made up his mind, Anderson testified that he had decided to think about it that evening and discuss it with his wife. Asked whether he had arranged a meeting between Murchek and Thannisch before he cancelled the Lupfer contract, Anderson insisted it was only a "potential introduction"—"[i]f things progressed and Mr. Lupfer was terminated as the PA, then there would—could be a potential meeting later that day." He "was very sure [he] was going to terminate that contract" by the morning of January 19 and agreed that by the time he sent Lupfer the termination notice, he had already told Murchek that Thannisch would be available to meet.

Anderson was asked about whether he expected Lupfer to start work immediately after the contract was signed or wait seventy-two hours. He testified, "We didn't discuss when he would start," but acknowledged that there was a meeting set for January 18 and that he expected Lupfer "most likely to attend that meeting and would start then." He also said, "It's his decision if he wanted to start before 72 hours. It wasn't mine."

Murchek testified about inspecting the property with Lupfer and about his communications with Anderson, including those related to meetings with Beneke. Murchek observed that in those initial inspections, neither he nor Lupfer had a copy of the policy and so could not determine whether the policy provided for replacement costs or cash-value, which considers depreciation, on damaged structures. He testified that the claim took about two years

to close; that he did not use any information obtained from Lupfer in making a reserve worksheet that he used to prepare an initial report to the insurer; and that in his experience, a ten-percent PA fee "is pretty high," "especially on a claim of this size." Murchek's report to the insurer, dated January 20, states that he conducted an "initial inspection" of the marina with Lupfer and Choate on January 18, and that after that inspection, Anderson notified Murchek that he had terminated his relationship with Lupfer and was "planning to meet with a new PA and sign with them." Murchek had "not received a letter of representative from the new PA as of yet."

Beneke testified that when Anderson called on January 18, Anderson said he had "engaged a public adjuster to help him with the claim" but "was wanting to end that contract." Beneke said that when he learned that Anderson had hired Lupfer, he "let him know that I couldn't represent him if that was the case." Anderson "indicated—or my impression was that he intended to terminate the agreement and asked if I was available if he did. And I said yes." Beneke did not recall if he was told that Lupfer was actively working the claim, but he testified that he did not know that Lupfer was at the marina when Anderson called.

The next morning, Anderson emailed Beneke to say he had terminated the Lupfer contract, and Beneke responded that he would have an associate "stop by there in the afternoon and just take a look around and, you know, be—start to become familiar with the—with the project." Beneke was asked about an email Murchek sent to Anderson at 5:17 a.m. on January 19, before Anderson sent Lupfer the cancellation notice. In that email, Murchek stated that he looked forward to meeting Anderson's representative in the Dallas area that day, saying that representative "will need to drive right past" a certain restaurant "on his way through town." Beneke acknowledged that "[i]t would appear" that Murchek was talking about a Beneke employee, not a Lupfer employee. Soon after Anderson sent Lupfer the cancellation email, he

8

emailed Murchek again, saying, "I have terminated the contract with [Lupfer], effective today. I will advise you later if [Thannisch] with [Beneke] will be traveling to Denton today," and Beneke explained that Anderson and Murchek had talked the night before "where that may have been discussed as well so that [Murchek] had a heads-up that we might be getting involved. And so this was just confirmation of that for him the next morning." Murchek sent an email to an engineering firm at 9:10 a.m. saying that he had "a meeting with the insured and PA already scheduled" the following week, but Beneke testified that he did not believe he had scheduled any meetings at that point: "This is the morning where Jerry sent the email terminating the contract, and it's roughly all around the same time. And I had not talked to anybody at this point. So I—I do not know who the PA he's referring to is."

Anderson sent Beneke the signed contract at 4:23 p.m. on January 20, and Beneke was asked whether his reviewing Anderson's insurance policy or having Thannisch meet with Murchek amounted to starting work without a contract. He disagreed that it was, saying:

> We all do it all the time in order to determine what kind of coverage we have to work with and whether it's a claim that we can really help somebody with or not or that would factor into the fee that we might charge. . . . [W]e review policies all the time, whether we get hired or not, as part of that process.

Beneke testified that after Anderson signed the contract, Thannisch "spent four or five days there in the week—probably the week after we were hired." Thannisch "literally went item by item and room by room and put together the scope of work that became the claim." Beneke explained that he will try to "agree on a scope of work" during his first meeting with the insurance company but that "rarely do you ever agree on every item in the first meeting."

9

**DISCUSSION**

"A claim for tortious interference with a contract consists of four elements: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) the willful and intentional interference caused damage; and (4) actual damage or loss occurred." *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 588 (Tex. 2017). "A defendant may defeat a tortious-interference claim on summary judgment by disproving at least one element of the claim as a matter of law." *Id.* We first consider whether there was any evidence raising a fact issue as to whether the Lupfer contract was a contract subject to interference and, if so, whether Beneke willfully and intentionally interfered with it.[4]

To maintain a tortious-interference claim, a plaintiff must produce some evidence that the defendant knowingly induced a contracting party to breach his contractual obligations, which requires the plaintiff to show that "some obligatory provision of a contract has been breached." *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 532 (Tex. App.—Fort Worth 2009, pet. denied). "Ordinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference." *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997); *New York Life Ins. v. Miller*, 114 S.W.3d 114, 125 (Tex. App.—Austin 2003, no pet.). Intentional interference does not require intent to injure, only a desire to cause the

---

[4] The standards guiding our review of summary judgments are well established. We review the granting of summary judgment de novo, taking as true all evidence favorable to the nonmovant, indulging reasonable inferences and resolving doubts in its favor. *Community Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 680 (Tex. 2017); *see* Tex. R. Civ. P. 166a(i). A no-evidence motion should be affirmed if the nonmovant does not "produce more than a scintilla of evidence on the essential elements of a cause of action challenged by a no-evidence motion." *Hansen*, 525 S.W.3d at 680-81. In reviewing a traditional summary judgment, we ask whether the movant showed that no genuine issue of material fact existed and that it was entitled to judgment as a matter of law. *Id.* at 681. If the court does not specify its grounds for granting summary judgment, we will affirm if any of the asserted grounds are meritorious. *Id.* at 680.

10

consequences of an act or a belief that the consequences are substantially certain to result. *Southwestern Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992); *see John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.*, 17 S.W.3d 721, 730 (Tex. App.—Austin 2000, pet. denied) ("Texas courts have held that to satisfy this element of the cause of action for tortious interference, a party must be more than a willing participant; it must knowingly induce one of the contracting parties to breach its obligations.").[5]

The evidence establishes that Anderson had the statutory right to cancel the Lupfer contract. Anderson may have urged Lupfer to begin work immediately, even saying that he did not plan to rely on his termination right, but Lupfer has not produced evidence indicating that Anderson sought to *waive* his statutory right, much less that Beneke was somehow involved in any attempt to waive the waiting period, nor has he explained how such a right must be waived.[6] Lupfer insists that because he started to work immediately, the contract became an enforceable unilateral contract, but under this theory, a PA could attempt to nullify the statutorily required cancellation period simply by beginning work before the seventy-two hours had passed,

---

[5] *See also Taylor v. Henny*, No. 01-14-00650-CV, 2016 WL 1389151, at \*8 (Tex. App.—Houston [1st Dist.] Apr. 7, 2016, no pet.) (mem. op.) ("defendant's intent must be to effect a breach of contract, i.e., it must knowingly induce one of the contracting parties to breach its obligations'" (quoting *Fitness Evolution, L.P. v. Headhunter Fitness, L.L.C.*, No. 05-13-00506-CV, 2015 WL 6750047, at \*23 (Tex. App.—Dallas Nov. 4, 2015, no pet.) (mem. op.))); *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139 (Tex. App.—Eastland 1992, writ denied) (evidence must show defendant played active part in persuading party to breach contract).

[6] We have found no cases addressing waiver of a party's right to cancel a PA contract. However, the fact that the insurance code requires every contract to include a provision that informs the insured of his right to cancel, without including any language related to waiver of the right, would seem to imply at a minimum that a waiver of the right to cancel must be clear, if not explicit. *See Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 709 (Tex. 2021) ("Waiver need not be explicit, but intent to waive a right may be implied by conduct only 'if, in light of the surrounding facts and circumstances, it is unequivocally inconsistent with claiming that right.'" (quoting *LaLonde v. Gosnell*, 593 S.W.3d 212, 219 (Tex. 2019))).

and Lupfer has not pointed to any authority supporting that outcome. Finally, whether Anderson should be viewed as estopped from terminating his contract by his conduct is relevant to equitable, quasi-contractual claims against *Anderson*.

Inducing someone to do what he has the contractual right to do generally is not actionable interference, and Lupfer thus has not shown that he can maintain a claim for tortious interference against Beneke even if Beneke had induced Anderson to exercise his contractual and statutory cancellation right.[7]   *See ACS Invs.*, 943 S.W.2d at 430; *Vertex Servs., LLC v. Oceanwide Hous., Inc.*, 583 S.W.3d 841, 855-56 (Tex. App.—Houston [1st Dist.] 2019, no pet.). Indeed, Lupfer conceded in his deposition that it is allowable, if unethical, for one PA to encourage an insured to cancel another PA's contract within the cancellation window.

Further, the evidence does not raise a fact issue as to whether Beneke in fact did improperly induce Anderson to cancel the Lupfer contract. Lupfer asks us to infer that Beneke promised PA services at what Lupfer asserts is a "non-standard reduced rate" and conspired with Anderson to delay the cancellation so that they could take advantage of Lupfer's "substantial work." However, Murchek testified both that he did not use any information from Lupfer in drafting his initial report and that he believed Lupfer's ten-percent rate was quite high for a claim of this size,[8] while Lupfer admitted that he had no evidence that Beneke had improperly solicited Anderson's business and testified that he did not believe that Beneke had initiated contact with

---

[7] Even if a plaintiff can establish the elements of tortious interference, a defendant can still assert the affirmative defense of justification, which is "established as a matter of law when the acts the plaintiff complains of as tortious interference are merely the defendant's exercise of its own contractual rights." *Prudential Ins. Co. of Am. v. Financial Rev. Servs., Inc.*, 29 S.W.3d 74, 77-78, 81 (Tex. 2000).

[8] The insurance code caps the total commission a PA may receive at "10 percent of the amount of the insurance settlement." Tex. Ins. Code § 4102.104.

Anderson. Anderson testified that he had started having doubts about Lupfer by midday on January 18; that no one he spoke to that day had any positive input about Lupfer's work; that his wife and attorney advised him not to use Lupfer; and that he then contacted Beneke. The evidence also shows that Anderson told Beneke that he had a contract with Lupfer but planned to cancel it and that Beneke said that he could not work with Anderson if Anderson had another contract but that he was available if Anderson decided to terminate the contract.

Telling Anderson that Beneke would not work with him while he was under contract with another PA is not the same as improperly inducing Anderson to cancel the Lupfer contract, particularly given that Anderson was already considering cancelling the contract before he called Beneke. The deposition excerpts to which Lupfer points do not mention when Beneke's fee was discussed, and it is only Lupfer's withdrawn or struck suppositions that assert that Beneke agreed to charge a "reduced fee" or urged Anderson to wait to cancel until Lupfer had "substantially performed."[9] There is no evidence that Beneke promised a lower-than-usual fee or improperly agreed with Anderson to use Lupfer's work and have Lupfer's contract cancelled.[10] Further, the claim took about two years to complete, and although Lupfer said he

---

[9] Lupfer asserted that during the January 18 conversation, Beneke "discussed the impact of having [Beneke] provide adjusting services . . . at a lower fee instead of [Lupfer]" and "encouraged" Anderson to wait to terminate the Lupfer contract until after Lupfer "had performed substantially all of the work of the adjustment." However, those allegations were either struck by the trial court or withdrawn by Lupfer after Beneke objected to them.

[10] Lupfer argues that because "[t]here is no evidence of phone calls where the discussion of the reduced rate, or any rate, could have been presented (other than the two calls on January 18); the inference is that the reduced rate was presented in the January 18 calls as an additional incentive for Anderson and the marina to terminate" the Lupfer contract. However, Beneke notes that it can be equally inferred that he "simply charges a lower rate for bigger insurance claims, such as this one, so as to allow the insured to recover a larger portion of the insurance proceeds," an assertion supported by Murchek's testimony that, for a claim this size, ten percent was a high PA fee. *See City of Keller v. Wilson*, 168 S.W.3d 802, 813-14 (Tex. 2005).

13

worked for about sixteen hours in the first two days, he also testified that the claim likely would have required upwards of one hundred additional hours to complete. Lupfer has not shown evidence of tortious conduct by Beneke in his January 18 discussions with Anderson, and "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred," and the supreme court has explained that evidence does not rise above a scintilla if a factfinder would have to guess about the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 813 (Tex. 2005) (quoting *Tubelite v. Risica & Sons, Inc.*, 819 S.W.2d 801, 805 (Tex. 1991)). Lupfer has thus not produced more than a scintilla of evidence indicating that Beneke knowingly acted to induce Anderson to breach any obligations.[11] *See id.*; *see also Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139-40 (Tex. App.—Eastland 1992, writ denied) (defendant must be shown to have played active part in persuading party to breach his contract).

Lupfer did not raise a genuine issue of material fact as to whether Beneke willfully and intentionally interfered with a contract subject to interference. We overrule Lupfer's issues on appeal.

---

[11] Even if Beneke had agreed to lower his usual rate, given the statutory right to cancel a PA contract within seventy-two hours, it is not clear that gaining a competitive edge through a lower rate during the cancellation period would be tortious conduct. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 727 (Tex. 2001) ("harm that results only from lawful competition is not compensable by the interference tort"); *Vertex Servs., LLC v. Oceanwide Hous., Inc.*, 583 S.W.3d 841, 856 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (same); *see also Archives of Am., Inc. v. Archive Litig. Servs., Inc.*, 992 S.W.2d 665, 666-68 (Tex. App.—Texarkana 1999, pet. denied) (storage contract allowed for cancellation with written notice; defendant induced parties to move documents to its storage facility, which parties had contractual right to do; and thus "inducement to do what Lone Star and CTU had a right to do did not constitute tortious interference with the contracts"); *West Tex. Gas, Inc. v. 297 Gas Co.*, 864 S.W.2d 681, 686 (Tex. App.—Amarillo 1993, no writ) (defendant had legal right to persuade or attempt to persuade party to exercise its right to terminate contract and enter into agreement with defendant, thus such conduct did not constitute tortious interference with original contract).

## CONCLUSION

Because Lupfer did not raise a fact issue as to at least one element of his claim for tortious interference with a contract, the trial court properly granted summary judgment on that claim.  We affirm the trial court's order granting summary judgment in favor of Beneke.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Triana

Affirmed

Filed:   November 10, 2021